**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Anthony MEDINA (91–1852); Nathaniel Wilson (91–1869); Neville King (91–1891/1892), Defendants–Appellants.**

**Nos. 91–1852, 91–1869, 91–1891 and 91–1892.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 26, 1993.

Decided April 12, 1993.

Rehearing and Rehearing En Banc Denied July 27, 1993.

F. William Soisson (argued and briefed), Office of the U.S. Atty., Detroit, MI, for U.S.

Scott S. Furstman (argued and briefed), Santa Monica, CA, for Anthony Medina.

Kenneth R. Sasse (argued and briefed), Bellanca, Beattie & De Lisle, Detroit, MI, for Nathaniel Wilson.

Christopher A. Andreoff. (argued and briefed), Evans & Luptak, Detroit, MI, for Neville King.

Before: MERRITT, Chief Judge; and KENNEDY and GUY, Circuit Judges.

RALPH B. GUY, JR., Circuit Judge.

Defendants, Anthony Medina, Neville King, and Nathaniel Wilson, appeal their jury convictions and sentences for conspiracy to distribute and distribution of cocaine, unlawful use of a communication facility, and use of a firearm to facilitate drug trafficking. The defendants assert that their right to a fair trial was denied by decisions of the trial court which resulted in (1) restrictions on access to witnesses as well as restrictions on the cross-examination of witnesses, (2) denial of a continuance, (3) the government's refusal to turn over Jencks Act material, (4) introduction of certain evidence, and (5) failure to immunize potential defense witnesses. King and Medina further contend that they were improperly tried on the distribution counts because the trial court lacked venue. King also challenges the trial court's denial of his motion for severance, and Medina argues that the Double Jeopardy Clause prohibits his prosecution for conspiracy and for use of a communication facility to facilitate a drug trafficking offense because of an earlier federal conviction. Finally, all defendants challenge the sentences imposed by the trial judge. We affirm the convictions, but remand for resentencing of defendants King and Wilson.

### I.

On July 17, 1990, Medina, King, Wilson, and six others were charged in a 24–count indictment with various violations of federal law which centered around a conspiracy which allegedly existed from the beginning of 1984 until June 17, 1990. After a trial lasting almost two months, Medina, King, and Wilson were found guilty of one count of conspiracy in violation of 21 U.S.C. § 846 and one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841. King and Medina were found guilty of another count of possession with intent to distribute cocaine. In addition, Medina was found guilty on five counts of the unlawful use of a communication facility to facilitate drug trafficking in violation of 21 U.S.C. § 843, and Wilson was found guilty of one count of using a firearm to facilitate drug trafficking in violation of 18 U.S.C. § 924(c). All three defendants received sentences of at least 30 years in prison.

The evidence produced at trial established that as early as 1983 Edward Hanserd, a codefendant who earlier pled guilty to various charges, and his associates were distributing cocaine and other controlled substances in the Detroit area. During his plea proceeding, Hanserd admitted that between 1984 and 1989 he had been involved in the distribution of kilogram quantities of cocaine. Those associated with Hanserd's Detroit drug trafficking operation included Fred and June Jackson, Nathaniel Wilson, Paris Pettiford, and John Greene. Medina and King, both of California, began to supply cocaine to this organization by 1987.

Fred and June Jackson, Pettiford, Greene, and Kenneth Echavarria, one of Medina's employees, all testified for the government at trial. According to Echavarria, Hanserd had been in contact with Medina and King in 1987 regarding the supplying of cocaine. Meanwhile, the Jacksons were sent to California in late 1987 by Wilson to purchase cocaine. When the Jacksons were unsuccessful in purchasing cocaine from their regular source, they notified Wilson. He instructed them to contact Hanserd, who was in California. Hanserd introduced Fred Jackson to Medina, and the Jacksons ultimately purchased numerous kilograms of cocaine which were supplied by King. Then, in early 1988, the Jacksons again went to California to purchase cocaine from King and Medina with money supplied by Wilson.

Later, in January 1988, Hanserd purchased a multi-kilo quantity of cocaine from Medina and King, and Hanserd, Echavarria, Medina, and another person shipped it from California back to Detroit. Once there, the cocaine was turned over to Wilson. In March of 1988, Hanserd purchased an additional 47 kilograms of cocaine from Medina and paid him $647,000. Hanserd transported the cocaine from California to Detroit, and

later sold 31 of the 47 kilograms of cocaine to Wilson. Also in 1988, Echavarria, acting at the behest of Medina, twice delivered a half kilogram of heroin to Hanserd. One of the deliveries of heroin was transported by Echavarria in a red Masarati. The car was later seized from Wilson. Essentially, however, this was a cocaine, not a heroin, distribution network. Indeed, on June 12, 1990, Medina was arrested after attempting to sell three kilograms of cocaine to California law enforcement officers and Paris Pettiford, who by then had become a government informant. In all, according to the government, Hanserd and the people that worked for him distributed approximately a kilogram of cocaine per day over at least a two-year period.

The government also introduced evidence that the coconspirators often possessed large quantities of cash. In December of 1986, Detroit police officers seized approximately $167,000 from Wilson's residence. One year later, Wilson was stopped while driving a BMW automobile registered to Hanserd's grandmother and found in possession of cocaine, two hand guns, and an airline ticket stub showing a round trip between California and Detroit on December 6 and 7, 1987. In addition, Louisiana State Police stopped Hanserd and Medina in early 1988 and found approximately $197,000. In May of 1988, approximately $233,000 was seized from Medina and King. Finally, in January of 1989, law enforcement agents seized approximately $370,000 from Hanserd in Berrien County, Michigan.

## II.

Defendants raise several objections to various trial court decisions which they allege deprived them of a fair trial. In areas ranging from the bounds of appropriate cross-examination to the propriety of introducing certain evidence, the defendants maintain that the trial court made determinations which singularly and collectively violated the defendants' right to a fair trial. We analyze these arguments in turn.

### A. Cross–Examination of Witnesses

Kenneth Echavarria, one of Medina's employees who became involved in drug traf-

ficking, and DEA agent Richard Crock are the focus of defendants' claims that they were unable to effectively cross-examine witnesses. Specifically, defendants object to rulings of the trial court limiting their questioning of the two on cross-examination. They also contend that they were improperly denied access to Echavarria prior to cross-examination and to ten pages of Crock's grand jury testimony and a DEA interview report. Finally, defendants argue that they deserved a continuance to investigate the veracity of the statements made by government witnesses on direct examination.

■ During Echavarria's cross-examination, counsel for Wilson attempted to question him on alleged inconsistencies between the quantity of cocaine for which he was sentenced (400 grams) as a result of his plea bargain and the quantity of cocaine with which he was actually involved. The government objected to the "argumentative" form of counsel's question, which asked whether Echavarria "would have come into court and lied" about his involvement with cocaine. The trial court, finding that the defendants had already shown the jury that Echavarria received a "good deal" from the government in exchange for his testimony, sustained the objection.

Defendants also assert that they were restricted in their exploration of Echavarria's prior criminal history in that they possessed information that Echavarria had a 1985 California conviction for public intoxication and destruction of personal property that was not included in the calculation of his sentence. They sought to establish that Echavarria misled the probation officer responsible for compiling his presentence report by failing to mention his prior convictions. Out of concern that such questioning would divert the jury's attention away from the focus of the case, the trial court stopped further inquiry into the calculation of Echavarria's sentence because it was more prejudicial than probative. While a defendant has a Sixth Amendment right to confront and cross-examine witnesses, that right is not absolute; the trial court has discretion in determining the scope of cross-examination. *United States v. Atisha*, 804 F.2d 920, 929 (6th Cir.1986), *cert.*

*denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). Here, in limiting the defendants' cross-examination of Echavarria, the trial court did not abuse its discretion. In sustaining an objection to a question regarding the alleged disparity between the quantity of cocaine used for Echavarria's sentencing and the cocaine actually involved in his criminal activity, the trial court properly noted that any alleged disparity in quantity had already been established by defendants. Thus, the jury had enough information at that point to assess the defendants' theory that Echavarria received an improperly low sentence. *See Dorsey v. Parke,* 872 F.2d 163, 167 (6th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 103, 107 L.Ed.2d 67 (1989).

██ The trial court also did not abuse its discretion in deciding to prohibit further questioning about Echavarria's sentencing. Defendants charge that continued inquiry into Echavarria's sentencing would have demonstrated his willingness to lie in general and his motivation to lie in this case because of the extent of his criminal exposure. Federal Rule of Evidence 609 goes far in deciding this issue. None of the convictions that defendants sought to establish involved "imprisonment in excess of one year" or "dishonesty or [a] false statement" as required by Rule 609, rendering inadmissible the testimony defendants wished to elicit. Although defendants argue that they did not wish to introduce evidence of the crimes themselves, but rather were interested in Echavarria's willingness to lie about those crimes, we are reluctant to endorse such an end run around the federal rules of evidence. We are even more reluctant to do so when, as here, defendants had adequate opportunity to cross-examine Echavarria regarding his plea agreement. *See Atisha,* 804 F.2d at 929.

Defendants next allege that their right to effective cross-examination was impaired by the failure of the trial court to make Echavarria accessible to them prior to his cross-examination. The day before Echavarria was to testify, the government provided defendants with his grand jury testimony and defendants requested an opportunity to interview Echavarria prior to his cross-examination. The court denied the request at that time, but promised to revisit the matter after Echavarria's direct examination. After his testimony on direct examination, defendants renewed their request. Counsel for King told the court that he had spoken with Echavarria without his attorney present and Echavarria had consented to an interview with defense counsel. The trial court allowed the defendants that opportunity, provided Echavarria was advised by his attorney that he did not have to talk with anyone. Subsequently, Echavarria refused to be interviewed.

██ Witnesses are neither the property of the government nor of the defendant. *United States v. Matlock,* 491 F.2d 504, 506 (6th Cir.), *cert. denied,* 419 U.S. 864, 95 S.Ct. 119, 42 L.Ed.2d 100 (1974). Thus, defendants normally are entitled to access to prospective witnesses. *United States v. Pepe,* 747 F.2d 632, 654 (11th Cir.1984). Clearly, however, witnesses may refuse to be interviewed. *United States v. Bennett,* 928 F.2d 1548, 1553 (11th Cir.1991). Indeed, a defendant's right to access is tempered by a witness' equally strong right to refuse to say anything. *United States v. Scott,* 518 F.2d 261, 268 (6th Cir.1975). Thus, when claiming a denial of due process, a defendant must show more than just witness inaccessibility. The defendant must demonstrate specific prejudice from the denial of access. *Id.* Where, as here, there is an interest in security and the trial court ensures that defendants will have adequate time to interview the witness, the trial court's decision to delay access to witness Echavarria until after his direct testimony did not deprive defendants of their right to a fair trial. *Id.* at 268; *see also Pepe,* 747 F.2d at 655; *United States v. Walton,* 602 F.2d 1176, 1179–80 (4th Cir. 1979); *United States v. Pelton,* 578 F.2d 701, 708 (8th Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978). Moreover, the court's admonition to Echavarria's attorney that the witness need not talk unless he wanted to was altogether proper, for advising a witness of "his 'right not to submit to the interview [does] not deny the defendant a fair trial.' " *Matlock,* 491 F.2d at 506 (quoting *United States v. White,* 454 F.2d 435 (7th Cir.1971), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972)).

The defendants next assert that the government, in violation of the Jencks Act, withheld ten pages of grand jury testimony of agent Crock and a DEA interview report. 18 U.S.C. § 3500. The Jencks Act addresses demands for the production of statements and reports of witnesses. It states, in relevant part:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b).[1]

The government contends that the ten pages of Agent Crock's grand jury testimony withheld from defendants were either not his statements but the prosecutor's, or did not relate to the subject matter of his testimony, but rather related to Agent Crock's knowledge of witnesses and other individuals who were not called to testify. Thus, the government asserts that the trial court, which reviewed the excised grand jury testimony *in camera*, properly denied admission of the ten pages. The Jencks Act requires the production of only those statements "which relate to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Our review of the grand jury transcript, which was submitted to us under seal, substantiates the trial court's decision to withhold production of those ten pages, for they cover statements which do not relate to Crock's testimony. *See United States v. Sturman,* 951 F.2d 1466, 1486 (6th Cir.1991), *cert. denied,* ―― U.S. ――, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992); *United States v. Minkin,* 504 F.2d 350, 356 (8th Cir.1974) (defendant not entitled to transcript of grand jury testimony which did not relate to subject matter of case and which did not refer to defendant directly or indirectly or inferentially or otherwise),

*cert. denied,* 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975).

■ The trial court also did not err in denying defendants access to the DEA's interview file. We have held previously that an FBI report of a witness' statement is producible only if the notes from the interview were read back to and verified by the witness and if the report summarized the notes without material variation. *United States v. Padin,* 787 F.2d 1071, 1077–78 (6th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986) (upholding denial of production of DEA agent's report summarizing interview where witness never adopted the report by signing it, reading it, or having it read to her). Trial court rulings on such matters are subject to a clearly erroneous standard. *United States v. Nathan,* 816 F.2d 230 (6th Cir.1987). In finding that the materials were not Jencks "statements," the trial court committed no error because the file notes were not read back to Jackson, nor did she read the notes or in anyway know of their existence. Thus, any statements in the interview report were not hers, because she did not adopt the statements as her own. *See Id.* at 237 (even if reports accurately summarize all of the witness' statements, not considered a Jencks Act "statement" where witness does not adopt the statements).

Defendants maintain that the trial court did not review the DEA interview report, thereby requiring a remand for the court to examine the contents of the report to determine whether it constitutes a statement under the Jencks Act. However, the defendants' recollection of events does not square with the record. The trial judge stated repeatedly that she would review the report after defense counsel raised the issue, and she did later review it *in camera.* In any event, the document was submitted to this

---

1. The Jencks Act defines the term "statement" as:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

court under seal for review. Thus, a remand is unnecessary.

■ Finally, defendants contend that the trial court's failure to grant them a continuance to investigate government witnesses violated their right to cross-examine effectively. In particular, the defendants cite Fred Jackson as a witness they were unable to cross-examine adequately because they did not have a reasonable opportunity to prepare their case. For instance, defendants raise Jackson's conviction of drug trafficking charges in 1989 as a fact they uncovered in their investigation of his prior criminal history. However, Jackson testified regarding his prior conviction on direct examination; thus, the investigation uncovered nothing new.

■ The matter of a continuance is within the discretion of the trial judge. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). A showing of actual and specific prejudice is required for reversal of a judge's decision not to grant a continuance. *United States v. Knight*, 443 F.2d 174, 177 (6th Cir.1971). When claims of insufficient time for preparation are advanced, this court will examine the totality of the circumstances. *See id.* In this case, defendants had four days to prepare for Fred Jackson's cross-examination. Moreover, the trial court permitted defendants to recall any witness in the event any relevant evidence was discovered. The trial court, then, did not abuse its discretion in disallowing a continuance, particularly because defendants demonstrated no specific prejudice from the trial court's failure to do so.[2]

## B. Introduction of Evidence

Defendants claim that the district court committed reversible error by allowing the introduction into evidence of transactions involving heroin, firearms, and the seizure of large amounts of United States currency

from the defendants during the course of the conspiracy. Defendants also challenge the admissibility of evidence of Medina's June 12, 1990, arrest as not in furtherance of the conspiracy. Wilson next contends that the trial court compounded its errors in this case by failing to give a cautionary instruction to the jury at the time the evidence was admitted. Finally, evidence identifying King as present when the police seized $233,000 in May of 1988 is challenged because King argues that the government waived the use of that evidence.

First, referring to Federal Rule of Evidence 404(b), defendants maintain that evidence of heroin, firearms, and United States currency all constituted "other acts" which required exclusion under the federal rules. According to the defendants, the trial court failed to determine whether the evidence was admissible for a proper purpose and whether the probative value of each item outweighed its potential prejudicial effect as required by Federal Rule of Evidence 404(b).

■ Defendants, however, fail to properly consider the charges against them. The indictment charged the defendants with conspiracy to possess with intent to distribute and to distribute cocaine and *other controlled substances*. Thus, admission of evidence regarding delivery of heroin from Medina to Hanserd was evidence which tended to prove conspiracy, and did not constitute 404(b) "other acts" evidence. *See United States v. Walton*, 908 F.2d 1289, 1299 (6th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Federal Rule of Evidence 403 governs, and it allows evidence to be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. In reviewing the trial court's decision to admit the evidence of heroin delivery on an abuse of discretion standard, *United States v. Brady*, 595 F.2d 359,

2. Defendants also challenge the trial court's refusal to reopen cross-examination of Jackson and Crock by defense counsel who wished to elicit testimony regarding matters brought out by lawyers for other defendants. Defendant Wilson cites *United States v. Caudle*, 606 F.2d 451 (4th Cir.1979), in support of his argument that he should have been able to elicit testimony on new matters brought out in cross-examination by fellow counsel. However, *Caudle* involved new matters brought out on redirect examination, not cross-examination. Here, no new matters were presented on the redirect examination of witnesses Jackson and Crock. The trial court did not abuse its discretion in refusing to reopen cross-examination, particularly when it told counsel they could recall witnesses if they wished. No defendant chose to do so.

361 (6th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979), we find that the court did not abuse its discretion.

Similarly, the evidence relating to the defendants' possession of large amounts of United States currency during the relevant time period is admissible as tending to prove a conspiracy to possess with intent to distribute controlled substances. As we have stated previously, "[f]inancial aspects of drug trafficking represent an integral part of a conspiracy to distribute controlled substances." *United States v. Castro,* 908 F.2d 85, 88 (6th Cir.1990). In *Castro,* none of the defendants on trial were charged with money laundering, but the government sought to link the defendants to drug trafficking through testimony of a U.S. customs agent regarding the laundering of the proceeds of drug sales. *Id.* This court upheld the admissibility of that evidence, finding that the trial court did not abuse its discretion in finding the evidence more probative than prejudicial under Federal Rule of Evidence 403. We follow the same course here. The trial court did not abuse its discretion by admitting the evidence of possession of large amounts of United States currency, for such evidence tended to show that defendants had the resources to engage in significant drug trafficking. For similar reasons, evidence of possession of firearms is admissible to prove conspiracy to possess with intent to distribute controlled substances because such possession is ostensibly for the purpose of protecting the efficiency of the drug trafficking enterprise. *See United States v. Baker,* 855 F.2d 1353, 1358 (8th Cir.1988) (evidence of defendant's arrest for possession of a pistol and drugs admissible as evidence of the conspiracy), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989). Both pieces of evidence were relevant to the operation of this ongoing conspiracy.

The defendants next challenge the admissibility of evidence surrounding Medina's 1990 arrest for distribution of three kilograms of cocaine in that the arrest was not in furtherance of the ongoing conspiracy. Because Hanserd, the alleged ringleader of the entire conspiracy, had been arrested in June of 1989, defendants argue that the entire conspiracy had terminated and therefore evidence of Medina's negotiations and delivery of cocaine in 1990 should not have been admitted. In addition, defendants place much import on the fact that Paris Pettiford, who negotiated the cocaine sale with Medina, was at that point a government agent. After noting that "one cannot conspire with government agents," defendants urge that "it defies logic" that Medina could further a conspiracy when acting exclusively with a government agent. Further, defendants allege that evidence of the 1990 arrest demonstrated the existence of a number of smaller conspiracies rather than one comprehensive conspiracy.

At the outset, we reject defendants' argument that, because Pettiford acted as a government agent at all relevant times, the negotiation and sale of cocaine to Pettiford could not have been in furtherance of a conspiracy. Certainly, the defendants are correct in stating that the formal requirement of conspiracy is not met unless an individual conspires with at least one bona fide coconspirator. *See United States v. de Bright,* 742 F.2d 1196, 1199 (9th Cir.1984). Medina conspired with several bona fide coconspirators, including King, Wilson, and Hanserd. Thus, whether Pettiford remained a member of the conspiracy in 1990 matters not in determining whether evidence of the cocaine sale is admissible as evidence that the conspiracy continued to exist unabated despite Hanserd's incarceration. *See United States v. Barrett,* 933 F.2d 355 (6th Cir.1991) (affirming conviction of defendants on conspiracy charges based in large part on evidence of drug sales to government informant).

The remaining arguments regarding the admissibility of the 1990 arrest are resolved by examination of Federal Rule of Evidence 403. Defendants maintain that the conspiracy had ended by 1990, or, alternatively, that evidence of Medina's 1990 cocaine sale indicated the existence of several smaller conspiracies rather than one comprehensive conspiracy. Thus, defendants argue that the evidence is not admissible because it is not sufficient to prove a single conspiracy existed in 1990. But, evidence of the 1990 arrest is admissible if it both tends to prove the con-

tinued existence of a single conspiracy and if its probative value is not substantially outweighed by its prejudicial effect. Fed. R.Evid. 403. We find that the evidence meets this test.

In this case, the conspiracy continued until July 17, 1990, over a month after Medina's arrest in California. Although defendants argue that the conspiracy was dormant by 1990, the duration of the conspiracy is a jury question. *Walton,* 908 F.2d at 1299. A rational jury could have found that Medina's 1990 sale of cocaine was in furtherance of the conspiracy, because Hanserd's arrest does not necessarily signal its cessation. As the Eighth Circuit has noted, a drug trafficking organization, "by its very nature, is a loosely knit organization." *Baker,* 855 F.2d at 1357. Various members may enter and exit the conspiracy at different times. *Id.* Thus, evidence of continued attempts to distribute controlled substances in 1990 is admissible to prove that a single conspiracy lasted until that time. *See Walton,* 908 F.2d at 1299 (noting that admissibility of evidence under Federal Rule of Evidence 403 and sufficiency of evidence are separate questions and finding that evidence seized in defendants' home in 1988 admissible to prove continued involvement in conspiracy even though no other evidence existed of defendants' involvement after 1986).

■ Wilson further contends that the district court improperly failed to give a cautionary instruction to the jury at the time that evidence was admitted. The trial court elected to give no limiting instructions until the end of trial. Trial judges are in the best position to determine whether such an instruction would unduly emphasize the evidence in the minds of the jury. *United States v. Dabish,* 708 F.2d 240, 243 (6th Cir.1983) (citing *United States v. Weil,* 561 F.2d 1109, 1111 (4th Cir.1977)). Therefore, the court did not abuse its discretion in refusing to give a limiting instruction contemporaneous with the admission of evidence. *Id.*

■ Finally, defendant King challenges the admission of evidence identifying him as present during the May 1988 seizure of approximately $233,000 by California law enforcement officers. Police had conducted surveillance of a Nissan Maxima, and later seized $233,000 found in the trunk of the Maxima. King was placed at the scene because, as police converged on the Maxima, a brown Grand Prix left the scene and was later stopped by police. King was the driver of that car, and was returned to the scene, where he denied knowledge of the money.

King argues that during the third week of trial he was advised for the first time that the government planned to use evidence identifying him as present when $233,000 was seized in California in May 1988. According to King, the government had, in response to his pretrial motion to suppress evidence regarding "warrantless police conduct" on May 13, 1988, disclaimed further reliance on the use of any such evidence and therefore the government asserted that defendant's motion was moot. The trial court found "obvious confusion in the record" as to the true import of the government's decision not to contest King's motion to suppress evidence. Thus, the court held an evidentiary hearing to determine the legality of the stop of King's automobile, which precipitated this entire controversy. Finding the stop of the Grand Prix and the subsequent detention of King to be reasonable, the court allowed King to be identified as present when the money was seized. On appeal, King argues both that the entire issue is already mooted by the government's clear disclaimer and that the trial court determined erroneously that the stop and detention of King were reasonable.

On November 6, 1990, King moved for suppression of the results "of all warrantless police conduct" involving the Grand Prix on May 13, 1988, "including [King's] identity." In response, the government stated that "defendant King has moved to suppress evidence seized by police officers in May of 1988 as a result of a traffic stop of Neville King. The government does not intend upon using such evidence and thus the motion should be dismissed as moot." Concurrently, the government responded to a motion by King to suppress all statements by King taken in violation of *Miranda.* Because King failed to disclose any statements taken in alleged violation of his constitutional rights, the gov-

ernment urged that the motion be denied.[3] At a later pretrial hearing, the issue was discussed again.[4] Then, at opening argument, the government referred to money seized by California authorities which belonged to King.[5] The government argues that it only sought to introduce the existence of the seized money, King's presence at the

3. The joint appendix provided by the parties does not include King's motion to suppress statements taken in violation of *Miranda*. Thus, it is not clear to which motion the government was responding.

4. The pretrial proceedings are not a model of clarity, but the record reflects that the parties did not fully comprehend the magnitude of each other's position:

THE COURT: You have filed a motion seeking to suppress statements and fruits of searches.

MR. NEWTON: That's correct, Your Honor.

THE COURT: Everything from California?

MR. NEWTON: That's correct.

THE COURT: We were going to discuss it at this conference. Specifically, what is it you want suppressed and what [ ] is it you want to further develop?

MR. NEWTON: Your Honor, that deals with— my understanding that the only thing that the government is going to use is events that occurred on, approximately, December 21 and 22, 1989 with regard to any potential statements or alleged statements of Mr. King.

THE COURT: One moment. Is that correct, Mr. Soisson?

MR. SOISSON: Well, if he could be more particular.

MR. NEWTON: Croft.

MR. SOISSON: Croft.

MR. NEWTON: Croft.

THE COURT: All right.

THE COURT: I note you were writing and were possibly distracted.

Would the Court reporter read back that last statement by Mr. Newton, please.

(The Reporter then read back the last statement)

MR. SOISSON: I believe those are the only statements that we're introducing with regard to Mr. King was statements made at an incident on Croft Avenue in Los Angeles.

However, there was another incident we're also intending on introducing evidence of, that was a seizure of $233,000 where Mr. King was present.

MR. NEWTON: With regard to that, Your Honor, I had originally filed a motion with regard to that for a Motion to Suppress. And I was told that nothing seized from Mr. King would be used by the government.

THE COURT: Was that seized from him and does he have standing to challenge that?

MR. NEWTON: Yes.

THE COURT: Are you now stating you will be?

MR. SOISSON: He's never claimed he had standing with regard to this. Neville King was present and during the incident that occurred, the money was seized from the trunk of the vehicle that was not registered to Mr. King. I don't know where he's getting standing from now.

MR. NEWTON: I am not talking about the money.

MR. SOISSON: That's what we're planning on introducing is the money.

MR. NEWTON: We were talking about—

MR. SOISSON: The evidence concerning that incident.

MR. NEWTON: We're talking about statements.

THE COURT: There's separate ones. The statements he does intend to use and you are challenging.

MR. NEWTON: I—also, I filed with regard to physical evidence. I filed two motions on warrantless stops. One dealt with Croft, which was the December 21, December 22, 1989 matter, which the government intends to use matters from.

THE COURT: What was produced in that evidence?

MR. NEWTON: There was a search. There were firearms recovered. Money was recovered. A money counter was recovered.

THE COURT: All of that the government will seek to introduce? All of that you're seeking to suppress?

MR. NEWTON: That's correct.

THE COURT: All right.

MR. NEWTON: Then with regard to the incident that Mr. Soisson is talking about, there was a warrantless stop of a vehicle driven by Mr. King that I filed a motion to suppress with regard to that particular stop of Mr. King.

THE COURT: What was the result of that?

MR. NEWTON: With regard to that stop, I was told by Mr. Soisson he was not going to introduce evidence of that stop of Mr. King at trial. That's different than the seizure of the money.

MR. SOISSON: You're correct.

THE COURT: That's resolved. You'll need an Evidentiary Hearing on the other.

MR. NEWTON: As long as there is no evidence of that stop, yes.

THE COURT: I believe he just indicated there is not, correct, Mr. Soisson?

MR. SOISSON: Correct.

MR. NEWTON: So we're on track.

THE COURT: All right. So on that one, we will need a hearing.

5. The government attorney stated:

[MR. SOISSON] You will hear that during, also, during that month on May 13, 1988, approximately $220,000 in cash money that belonged to Neville King, was seized by authorities out in California and that money was supposed to be used to purchase Cocaine.

scene, and statements denying knowledge of the money. Its response to King's motion which declared the issue moot, according to the government, encompassed only the physical evidence involved in the May 13, 1988, stop of King. Thus, any statements made by King denying knowledge of the money were introduced properly because the government responded to the admissibility of those statements in its brief regarding potential *Miranda*-violative statements.

Having reviewed the entire record on this matter, we find that the trial court did not commit clear error in concluding that the record was unclear on this point. *See United States v. Lambert*, 771 F.2d 83, 89 (6th Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985). King's motion urging suppression of all evidence of the stop specifically mentioned King's identity as one of the pieces of evidence he sought to have suppressed, and the government's response suggested that the issue was moot. However, the discussions at the pretrial conference and the government's opening statement should have alerted King that the government's understanding of the evidentiary issue did not coincide with King's understanding. The trial court, then, held an evidentiary hearing regarding the reasonableness of the stop and detention of King. After finding the detention reasonable, the court allowed introduction of evidence placing King at the scene.

The trial court properly held that King's Fourth Amendment rights were not violated. The stopping of the Grand Prix driven by King and the resulting detention of the occupants of the car constituted a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). Such "seizures" are permissible only if supported "by a reasonable and articulable suspicion that the person seized [was] engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980). Under the totality of the circumstances, the officer in this case had a reasonable and articulable suspicion that the person was engaged in criminal activity. *See United States v. Knox*, 839 F.2d 285, 289 (6th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). King

fled from the scene in the Grand Prix at a high rate of speed just as police were converging on an area which had been under surveillance for hours. Thus, it was reasonable to assume that King had something to do with the events which were unfolding.

In returning King to the scene for brief questioning about his knowledge of the incident, the officers did not exceed the permissible scope and duration of an investigative detention. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (investigative detention must be temporary and last no longer than is necessary to effectuate purpose of the stop and investigative methods must be least intrusive means available to verify or dispel officer's suspicion). Officer Volz, who had undertaken the surveillance of the area, noticed the Grand Prix driving away and requested that other officers stop the automobile. Thus, it was reasonable for King to be returned to the crime scene for brief questioning. Although the detention lasted between thirty minutes and one hour, no per se rule exists as to the permissible duration of an investigatory stop. *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The police were in the process of questioning nine individuals who were at the scene, necessarily lengthening the permissible scope of detention. *See Knox*, 839 F.2d at 290–91; *see also United States v. French*, 974 F.2d 687, 694 (6th Cir.1992) (detention lasting 45 minutes not unreasonable under the totality of circumstances), *cert. denied*, —— U.S. ——, 113 S.Ct. 1431, 122 L.Ed.2d 798 (1993). In sum, the court properly admitted evidence which placed King at the scene when police seized $233,000 from another car.

## C. Failure to Immunize Witnesses

The defendants next challenge the trial court's actions regarding two potential defense witnesses, Ed Hanserd and Dion Childress, who had earlier pled guilty. Defendants contend that the court committed reversible error by refusing either to immunize the witnesses or to compel the government to grant the witnesses use immunity. Further, error is alleged from the court's failure to conduct an evidentiary hearing to determine

the scope of the Fifth Amendment privilege asserted by both prospective witnesses. Defendants also suggest that the court improperly influenced the witnesses' decision to assert their Fifth Amendment privilege.

■ We have held consistently that a district court has no authority to grant immunity to a witness who asserts the Fifth Amendment privilege. *United States v. Mahar,* 801 F.2d 1477, 1495 (6th Cir.1986); *United States v. Pennell,* 737 F.2d 521, 527 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *United States v. Lenz,* 616 F.2d 960, 962 (6th Cir.), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). We are bound by our previous rulings on this matter. Other circuits have indicated that, under appropriate circumstances, they might find that a prosecutor's immunity decisions violate due process. *See, e.g., United States v. Westerdahl,* 945 F.2d 1083, 1086–87 (9th Cir.1991); *United States v. Frans,* 697 F.2d 188, 191 (7th Cir.), *cert. denied,* 464 U.S. 828, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983); *Earl v. United States,* 361 F.2d 531, 534 n. 1 (D.C.Cir.1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967). Defendants maintain that the government engaged in misconduct by failing to immunize Hanserd and Childress when both witnesses possessed allegedly relevant and exculpatory information. Although we have discussed the prosecutorial misconduct theory previously, we have generally declined either to accept or reject the theory. *See Pennell,* 737 F.2d at 526 (reserving the question whether prosecutorial misconduct in making immunity decisions can constitute a due process violation); *Lenz,* 616 F.2d at 963–64; *see also United States v. Gullett,* 713 F.2d 1203, 1210 (6th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984). We decline the invitation to recognize the theory here, particularly when the defendants have made no showing that the government acted affirmatively to prevent testimony of defense witnesses. *See Westerdahl,* 945 F.2d at 1086 (decisions on prosecutorial misconduct have focused on whether the government or its agents took affirmative actions to prevent defense witnesses from testifying). The fact that the government did not make available to the defendants Childress' statement that he had never met Neville King does not constitute misconduct.[6] The government never attempted to prove that Childress did know Neville King. Indeed, in a conspiracy, it is often the case that many members do not know each other. Therefore, Childress' statement did not in any way exculpate King.

■ Defendants next challenge the district court's acceptance of the assertion of a Fifth Amendment privilege by the two witnesses without any inquiry into the legitimacy or scope of the privilege. The law of this circuit requires a witness "to take the witness stand and assert the [Fifth Amendment] privilege in response to particular questions." *United States v. Stephens,* 492 F.2d 1367, 1374 (6th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 93, 42 L.Ed.2d 83 (1974); *see also In re Morganroth,* 718 F.2d 161, 167 (6th Cir.1983) ("The privilege must be asserted by a witness with respect to particular questions, and in each instance, the court must determine the propriety of the refusal to testify."). Both Hanserd and Childress took the witness stand and asserted their right not to answer any questions, and the court found assertion of the privilege sufficient without further probing to determine whether the witnesses would be inclined to answer any questions.

Although it would have been preferable for the trial judge to have engaged in a deeper inquiry into the scope of the witness' privilege, no fundamental rights were affected by the court's ruling. *See Mahar,* 801 F.2d at 1495–97 (court's failure to make particularized inquiry into scope of privilege harmless error). Both Childress and Hanserd had a colorable basis to assert the privilege in that the specter of further state prosecution was real. *People v. Formicola,* 407 Mich. 293, 284 N.W.2d 334, 336 (1979) (double jeopardy

---

**6.** Defendants assert Childress also stated that he had never met Medina. But, if that were the case, the government did not have knowledge of that statement. In response to a question by Medina's counsel, the prosecutor stated, "I don't know if he's ever seen, met or knows anything about Anthony Medina." By contrast, the prosecutor stated emphatically that "Dion Childress never met Neville King."

clause of Michigan Constitution does not bar state prosecutions subsequent to federal prosecutions for offenses arising out of the same act where the interests of the two forums are substantially different). Moreover, the witnesses, after consultation with counsel, were adamant that they wished to invoke the Fifth Amendment with regard to any questions. Thus, a particularized inquiry by the court would have been futile.

### III.

Defendants Medina and King next contend that with respect to counts two and three of the indictment, which charged them and others with possession with intent to distribute cocaine, venue was improper in the Eastern District of Michigan. Because the involvement of the defendants in the distribution of cocaine was limited entirely to California, and because no evidence existed that defendants were anywhere other than in California at the operative periods of time, they allege that their actions did not establish venue for trial in Michigan.

 Defendants' arguments are without merit. Possession with intent to distribute a controlled substance is a continuing offense which under 18 U.S.C. § 3237 [7] may be tried in any district in which the crime took place. *See United States v. Delgado,* 914 F.2d 1062 (8th Cir.1990); *United States v. Davis,* 666 F.2d 195, 199 (5th Cir.1982). Here, the possession offense was continued and completed in Michigan when narcotics were distributed to various purchasers. Thus, even though Medina and King never themselves appeared physically in Michigan, the offense continued into the state. The government met its burden of showing by a preponderance of the evidence that the trial occurred in the same district as the criminal offense. *Id.* The district court did not abuse its discretion in denying the defendants' motions to change venue. *See United States v. Turner,* 936 F.2d 221, 226 (6th Cir.1991).

### IV.

 Defendant King claims that the trial court improperly denied his motion for severance. Prior to trial and after the government rested its case, King moved for a severance pursuant to Federal Rule of Criminal Procedure 14 claiming insufficient evidence to prove conspiracy and prejudice arising from joinder. The trial court denied all of King's motions for severance.

The decision on a Rule 14 motion is left to the court's discretion, and the denial of a severance " 'will not be disturbed on review unless the district court abused its discretion.' " *United States v. Swift,* 809 F.2d 320, 322 (6th Cir.1987) (citation omitted). To establish an abuse of discretion requires a showing of strong prejudice. *Id.* (citing *United States v. Gallo,* 763 F.2d 1504, 1525 (6th Cir.1985), *cert. denied,* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986)). The movant must demonstrate the jury's inability to "separate and treat distinctively evidence relevant to each particular defendant." *Id.* Thus, as we have stated previously, even if some potential jury confusion is established, it " 'must be balanced against society's need for speedy and efficient trials.' " *Id.* (citation omitted).

The trial court properly denied King's motion to sever. King was not prejudiced by a "spillover" of evidence which pertained to other coconspirators. Much of the evidence about which King complains—including the introduction of evidence of firearms, narcotics, and currency—tended to prove the existence of a drug trafficking conspiracy. *See Swift,* 809 F.2d at 322–23. The jury clearly was capable of analyzing separately the evidence as it related to each defendant, particularly in light of the fact that the jury acquitted two of the defendants of all charges. *See United States v. Frazier,* 584 F.2d 790, 795 (6th Cir.1978) (jury presumed capable of sorting out evidence and considering each count and each defendant separately).

---

**7.** Section 3237(a) provides:

> (a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.
>
> 18 U.S.C. § 3237(a).

588

## V.

Defendant Medina invokes the Double Jeopardy Clause in support of his argument urging dismissal of the counts charging conspiracy and use of a communication facility to facilitate the distribution of cocaine. In an earlier federal proceeding in the Central District of California, Medina was indicted and convicted for possession with intent to distribute cocaine. This conviction resulted from a sting operation in which Paris Pettiford negotiated over the phone with Medina for the purchase of cocaine, resulting in a sale of cocaine by Medina to government agents on June 12, 1990. The tapes of the telephone conversations between Pettiford and Medina were introduced at Medina's trial in California as evidence of Medina's intent to distribute cocaine. The conspiracy charge in this case specifically mentioned the 1990 drug sale. Moreover, the counts charging improper use of a communication facility referred solely to the five phone conversations between Pettiford and Medina. Hence, Medina contends that the Double Jeopardy Clause bars his prosecution in this case because it would, by necessity, rely on proving conduct for which Medina has already been prosecuted and convicted.

■ *United States v. Felix*, —— U.S. ——, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992), forecloses Medina's argument on the conspiracy count. A substantive crime and a conspiracy to commit that crime are not the "same offense" for purposes of double jeopardy, even if based upon the same underlying incidents, "because the 'essence' of a conspiracy offense 'is in the agreement or confederation to commit a crime.'" *Felix*, —— U.S. at ——, 112 S.Ct. at 1384 (quoting *United States v. Bayer*, 331 U.S. 532, 542, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947)). In *Felix*, for example, of the nine acts supporting the charge of conspiracy against Felix, two were based on conduct for which he had already been prosecuted. *Felix*, —— U.S. at ——, 112 S.Ct. at 1383. Thus, prosecution of Medina for conspiracy was proper, even though one of the incidents relied upon in the indictment already had resulted in a separate prosecution and conviction.

■ Defendant relies heavily on *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), in arguing that his prior conviction bars his prosecution in this case under 21 U.S.C. § 843(b) for use of a communication facility with the intent to distribute cocaine. In *Grady*, the Supreme Court added an additional step to the traditional *Blockburger* test, which prohibits successive prosecutions under the Double Jeopardy Clause for the same criminal act or transaction under two criminal statutes except when one statute requires proof of a fact which the other does not. *Grady*, 495 U.S. at 516, 110 S.Ct. at 2090 (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)). The Court stated that "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Id.* at 521, 110 S.Ct. at 2093. Medina seizes upon this language in arguing that in order to satisfy the necessary element of intent for violation of § 843(b) in this prosecution, the government proved conduct that constituted an offense for which Medina had already been prosecuted and convicted.

Neither *Grady* nor its less expansive successor, *Felix*, reach as far as Medina would like. *Grady* specifically rejected the adoption of a "same evidence" test, whereby the government would be prevented from introducing in a subsequent prosecution evidence introduced in an earlier proceeding. *Grady*, 495 U.S. at 521, 110 S.Ct. at 2093; *see also Felix*, —— U.S. at ——, 112 S.Ct. at 1382 (*Grady* disclaimed any intention of adopting "same evidence" test). Yet, Medina makes that very argument, for the government in this case simply used evidence of Medina's use of the telephone in two separate prosecutions.

*Grady* involved the prosecution of a defendant for homicide and assault charges after the defendant had driven his car across the median line of a two-way highway and struck an oncoming car, killing one of its occupants. In a separate proceeding, the defendant had already pled guilty to driving while intoxicated and with failing to keep right of the

median on traffic charges which arose from the accident. In the later prosecution, the state sought to rely on the two previous traffic offense convictions to sustain the homicide and assault charges. The Court concluded that the Double Jeopardy Clause protected the defendant. *Grady,* 495 U.S. at 521, 110 S.Ct. at 2093. Here, however, the government has not relied upon Medina's earlier conviction for possession with intent to distribute cocaine in proving Medina used a communication facility in violation of § 843(b). Nor is the government relying on conduct that constituted an offense for which defendant has been convicted. Thus, *Grady* is not applicable to this proceeding.

Moreover, in *Felix,* the Supreme Court specifically affirmed separate prosecutions in a setting very similar to this case. In *Felix,* defendant had an ongoing Oklahoma operation which manufactured methamphetamine. The DEA shut down that operation, and defendant attempted to resume operating in Missouri. However, the DEA had infiltrated his operation, and he was arrested and charged in Missouri with the offense of attempting to manufacture an illegal drug. Defendant was convicted after a trial in which the government introduced evidence of his Oklahoma operation in order to prove criminal intent. Later, defendant was charged in five counts of an Oklahoma indictment with substantive drug offenses, and he was convicted. At trial, the government introduced much of the same evidence of the Missouri and Oklahoma transactions that had been introduced at the earlier Missouri trial. The Court affirmed the convictions because it found that the government could "offer[ ] in evidence in one prosecution acts of misconduct that might ultimately be charged as criminal offenses in a second prosecution." *Felix,* —— U.S. at ——, 112 S.Ct. at 1382. Because that is exactly what occurred here, the Double Jeopardy Clause does not protect Medina from prosecution for violation of § 843(b).

**VI.**

Defendants all argue that they were sentenced improperly. All challenge the trial court's determination of the quantity of drugs attributed to them, and they also contend that their Confrontation Clause rights were violated when the trial court denied a request to hold an evidentiary hearing regarding drug quantity. In addition, the defendants individually question the trial court's decision to attribute two-point enhancements to Wilson for obstruction of justice and for a leadership role, a two-point enhancement to King for use of a firearm during a drug offense, and a two-point enhancement to Medina as an organizer of the offense.

A sentence may not properly be imposed on the basis of material misinformation. *Roberts v. United States,* 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980). However, we have recently reiterated that "specific procedures, such as are required at trial, are simply not constitutionally mandated." *United States v. Silverman,* 976 F.2d 1502, 1508 (6th Cir.1992) (en banc). Thus, the trial court's decision to deny the request for an evidentiary hearing did not violate the defendants' Confrontation Clause rights.

**A. Drug Quantity**

All defendants claim that the determination of drug quantity was improper in that it included statements made by Medina to Paris Pettiford that Medina had a 500 kilogram shipment of cocaine in Mexico awaiting delivery. Defendants insist that this statement was mere "puffery," particularly when the subsequent sale of cocaine by Medina to undercover police officers involved only three kilograms of cocaine. King and Wilson argue further that, whether or not Medina's statement can be counted toward his sentence, Medina's statements were not reasonably foreseeable by them as required by the commentary to Sentencing Guidelines section 1B1.3.[8]

---

8. Defendants also argue that a special verdict form should have been given to the jury so that it could determine the quantity of drugs involved in the conspiracy. The amount of controlled sub-

stances is not an element of the offense and is properly left to the court for consideration at sentencing. *United States v. Sawyers,* 902 F.2d 1217, 1219 (6th Cir.1990), *cert. denied,* —— U.S.

■ A district court must apply the guidelines in effect at the time of sentencing. *United States v. Nagi*, 947 F.2d 211, 213 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992). Defendants were sentenced in July 1991. The relevant guideline in effect was section 2D1.4, since deleted, which states:

(a) Base Offense Level: If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

U.S.S.G. § 2D1.4 (1991). In addition, application note one to the guideline provided that "the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." The note went on to explain:

However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

U.S.S.G. § 2D1.4, comment. (n. 1).

■ The amount of drugs involved for sentencing purposes need only be proved by a preponderance of the evidence. *United States v. Moreno*, 899 F.2d 465, 473 (6th Cir.1990). The trial court's conclusions regarding the quantity of drugs for sentencing purposes are subject to review under the clearly erroneous standard. *United States v. Saenz*, 915 F.2d 1046, 1047 (6th Cir.1990). With regard to Medina, the court found that he was involved "in a minimum 500 kilos and there's substantial evidence to support not only that, but more.... And you might argue as puffing, but there's a lot more in there, counsel, th[a]n his puffing." The trial court's determination that Medina was involved with at least 500 kilograms of cocaine is not clearly erroneous. Having found that Medina was a major supplier of drugs for the Hanserd conspiracy, Medina could be found to have had the intent and capability to deliver on his statements regarding a large cocaine shipment. *See United States v. Gessa*, 971 F.2d 1257 (6th Cir.1992) (en banc) ("conversational cocaine" talk may be used for sentencing).

■ The trial court's attribution of 500–1,500 kilograms of cocaine to defendants King and Wilson is more problematic. The presentence reports of both defendants found them responsible for 1,028 kilograms of cocaine. This figure included the 500 kilograms of cocaine discussed by Medina with a government informant. The trial court found both defendants responsible for the total quantity of drugs in the conspiracy without making the additional finding that it was reasonable to impute knowledge of all of the conspiracy's criminal activity to King and Wilson.[9] The guidelines require a finding of

——, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991); *see also United States v. Hodges*, 935 F.2d 766, 770 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 251, 116 L.Ed.2d 206 (1991).

9. In sentencing Wilson, the court stated: "Based on the record as I have it, counsel I will have to find him responsible for more than 500 because of the quantities involved during the life of that conspiracy. That's what the case law requires based upon specific amounts of drugs."
King's sentencing hearing included the following colloquy:

THE COURT: Mr. Newton, you were here when the Court advised that in [the] Sixth Circuit and based on all the research we have done, that your client will be answerable for the total quantities of drugs during the life of the conspiracy.
MR. NEWTON: Your honor, I've heard that. And without meaning in any way to disparage the court, Your Honor, that's not my understanding of Sixth Circuit law.
. . . .
... [T]he question is what is clearly foreseeable or what a defendant is involved with.
. . . .
MR. NEWTON: I presume, then, that Your Honor's ruling would be, if my position is correct with regard to the foreseeability requirement, Your Honor is not reaching that question because Your Honor doesn't think you have the ability to do so; is that correct?
THE COURT: I'm not going to do so, counsel. I read that as that's not appropriate for the court at this time. And I'm inclined to hold him responsible for everything that was being done while he was a member of that conspiracy.
MR. NEWTON: Okay. So whether or not it would be foreseeable. Thank you.

reasonable foreseeability with regard to acts and omissions of others in furtherance of the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B); *see also Gessa*, 971 F.2d at 1265 n. 6 (foreseeability as to the defendant is a requirement for sentencing); *United States v. Edwards*, 945 F.2d 1387 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992); *Hodges*, 935 F.2d at 774. In order for the trial court to make the necessary findings, the sentences of both King and Wilson must be vacated and their cases remanded.

## B. Obstruction of Justice

Pursuant to section 3C1.1 of the guidelines, the trial court enhanced Wilson's sentence by two levels for obstruction of justice. The section provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1 (1991). The commentary to section 3C1.1 explains that the enhancement applies when a defendant testifies untruthfully concerning a material fact. Wilson argues that the trial court violated his constitutional right to testify by applying the enhancement after he denied involvement in the conspiracy during his testimony. Further, Wilson maintains that the trial judge misunderstood the guidelines by assuming that she had no discretion in assessing the two-level enhancement.

 Although a defendant has a right to testify at trial, there is no constitutional right to testify untruthfully. *United States v. Grayson*, 438 U.S. 41, 54, 98 S.Ct. 2610, 2617, 57 L.Ed.2d 582 (1978). Where the defendant is believed to have attempted to obstruct justice by lying during his testimony, the Constitution does not protect a defendant from increased sentencing. *See United States v. Acosta–Cazares*, 878 F.2d 945, 953 (6th Cir.), *cert. denied*, 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989). Sentencing courts retain discretion in deciding whether a defendant's actions constitute an obstruction of justice punishable under the

guidelines, and we review such decisions under an abuse of discretion standard. *United States v. Bennett*, 975 F.2d 305, 308 (6th Cir.1992). However, as we have explained previously, "[o]nce a sentencing court makes a factual finding as to the applicability of a particular adjustment provision, the court has no discretion, but must increase the offense level by the amount called for in the applicable provision." *United States v. Feinman*, 930 F.2d 495, 500 (6th Cir.1991). Therefore, circuit courts have upheld trial courts' determinations that justice was obstructed where judges have made a "specific finding" that a defendant lied. *United States v. Burnette*, 981 F.2d 874, 878 (6th Cir.1992) (per curiam); *see also United States v. Hamilton*, 929 F.2d 1126, 1130–31 (6th Cir.1991) (enhancement upheld where district court "made a credibility finding that the defendant 'has told one bare-faced lie after another during his sentencing' "); *United States v. Alvarez*, 927 F.2d 300, 302 (6th Cir.) (obstruction enhancement upheld where district court found that defendant, under oath, "did, indeed, lie"), *cert. denied*, —— U.S. ——, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991).

The district judge in this case failed to make any specific finding regarding Wilson's testimony under oath. Rather, the judge stated: "I heard the testimony. And I have the jury's verdict. They were the fact finders. Based on their verdict, he testified falsely. I can't say that the jury was wrong and substitute my judgment for theirs, that's not my role." Such deference to the jury's fact-finding role is inappropriate for sentencing purposes because the district court must itself make a finding that Wilson had obstructed justice. *Burnette*, 981 F.2d at 877–80 (reversing the sentence imposed because the court failed to make a clear or specific finding that defendant had obstructed justice); *see also United States v. Clark*, 982 F.2d 965, 970 (6th Cir.1993). Thus, we must reverse the enhancement imposed on Wilson for obstruction and remand for resentencing.

## C. Gun Enhancement

 King challenges the trial court's imposition of a two-level enhancement pursuant to section 2D1.1(b)(1) of the guidelines for

possession of a firearm during the commission of a drug offense. At the sentencing hearing, the government justified the proposed enhancement by relying on three incidents. First, as discussed in his presentence report, King had consented to a search of his California apartment in 1989 which uncovered over $78,000, a pistol, and a money counter. A narcotics dog also detected traces of narcotics on the money. Second, the government recounted that, when California police stopped King from fleeing the scene in May 1988 as they seized $233,000 from a Nissan Maxima, the police searched the vehicle that King was driving and found two weapons in the trunk of the car. Third, the government sought to attribute the weapon possession of other members of the conspiracy to King. The trial court concluded that King possessed weapons himself during the relevant time period, was familiar with weapons, and was involved in a conspiracy in which weapons were often used to protect the narcotics.

Defendant argues that no evidence exists that he possessed a weapon in furtherance of any drug activity in this particular conspiracy. The evidence discovered in the 1989 search of his apartment has not been tied to this conspiracy, according to defendant, and that evidence was eventually suppressed in a separate California proceeding. The weapons found in the car which King drove allegedly belonged to George Smith, the owner of the vehicle. Finally, King contends that the government's attempt to hold King responsible for others' possession of weapons came as a surprise to him because the government had not mentioned that argument prior to the sentencing hearing or in the presentence report.

At the outset, we reject the defendant's contention that he was surprised by the government's use of incidents not mentioned in the presentence report. The trial court may consider both the presentence report and other evidence before it when determining a defendant's sentence. Particularly where, as here, the sentencing hearing occurs after a lengthy, multi-defendant jury trial, a defendant should not be surprised when a trial court considers evidence developed at trial. Conversely, when a defendant pleads guilty

and sentencing is the only issue, a trial court will necessarily place much greater emphasis on the presentence report. But, that is not our case, and we turn to the question of whether the trial court clearly erred in enhancing King's sentence for weapon possession.

Ample evidence exists to justify King's enhancement. The housing of guns in King's apartment during the course of the conspiracy sufficiently links defendant to the weapons. *See Acosta–Cazares*, 878 F.2d at 952 (defendant properly convicted of substantive offense of using and carrying a firearm during and in relation to a drug offense where defendant kept weapons in his apartment, readily accessible, to facilitate his drug transactions). However, the trial court did not rely on that evidence alone. She also found that the others' possession of weapons could be attributed to King. *See United States v. Sanchez*, 928 F.2d 1450, 1459 (6th Cir.1991) (for a weapon possession enhancement to be proper, the government need only demonstrate that some member of the conspiracy possessed a weapon and that the possession of the firearm would be reasonably foreseeable by other members). We cannot say that the trial judge, who heard extensive evidence at trial regarding the intricacy and interrelationship of the conspiracy and its members, erred in finding that other members' possession of weapons was reasonably foreseeable as to King. Therefore, we affirm his enhancement for possession of a firearm.

### D. Other Enhancements

██ Both Wilson and Medina challenge their two-point enhancement based on the court's determination that they had an aggravating role in the offense as defined in section 3B1.1 of the guidelines. Specifically, the court imposed an enhancement for the defendants' roles as organizers or leaders in the criminal activity. U.S.S.G. § 3B1.1(c). In cases contesting the applicability of an enhancement provision, the government bears the burden of establishing by a preponderance of the evidence that the enhancement factors apply. *Id.* June and Fred Jackson testified at trial that they purchased cocaine with money they received from Wil-

son, and the court therefore found that Wilson acted in a leadership role at least as to them. Further, Echavarria recounted that Medina had supervised his transport of cocaine and heroin from California to Detroit on several occasions. The trial court's determination that both Wilson and Medina supervised the criminal activity of others was not clearly erroneous.

## VII.

The convictions of defendants King, Medina, and Wilson are **AFFIRMED.** The sentence of Medina is **AFFIRMED.** The sentences of King and Wilson are **VACATED** and **REMANDED** for resentencing.

MERRITT, Chief Judge, concurring in part and dissenting in part.

I disagree with the result reached in Part V of the Court's opinion holding that the Double Jeopardy Clause does not bar prosecution of Medina for use of the telephone to facilitate a drug transaction. As I understand the case, he was prosecuted in California for possession of the *same drugs.* The five California telephone calls facilitated the very transaction for which he was convicted in California. Without the facilitating telephone calls there would have been no drug transaction to prosecute in California, as I understand the situation. When telephone calls produce an alleged drug transaction, the government should not be allowed successively to prosecute the defendant for the telephone part of the offense after the defendant is convicted or acquitted of the drug offense underlying the use of the phone. It is true that the telephone count has two elements—drug possession plus use of the telephone to facilitate the drug possession— and the drug count has only one element, possession of drugs. But the two counts charge the same basic wrongful conduct. The core conduct, drug possession, is the same. The use of the phone is wrongful only as it relates to this conduct. This facilitating conduct is a component of the earlier offense, or in the words of the Supreme Court, "conduct that constitutes an offense for which the defendant has already been prosecuted."

*Grady v. Corbin,* 495 U.S. 508, 521, 110 S.Ct. 2084, 2093, 109 L.Ed.2d 548 (1990).

The old *Blockburger* test has been modified. As we said in *Pandelli v. United States,* 635 F.2d 533, 538 (6th Cir.1980):

> What the reviewing court must do now in applying *Blockburger* is go further and look to the legal theory of the case or the elements of the specific criminal cause of action for which the defendant was convicted without examining the facts in detail.

The Court's modification of the *Blockburger* test in its original, abstract form arises from a pervasive change in the criminal justice system noted by the Court in previous opinions—the increasing volume, complexity, vagueness and overlapping nature of criminal statutes. [citation omitted] The purpose of the Double Jeopardy Clause is to prevent trials and punishments that do not advance the deterrent and retributive purposes of the criminal justice system. Multiple punishments for multiple crimes or different criminal events advance those ends. Cumulative trials and punishments under several statutes that punish the same basic elements of wrongful conduct have little additional deterrent value but simply impose unnecessary additional pain on the defendant and wasteful costs on society.

There is no valid purpose to be served in allowing successive prosecutions for the telephone part of the offense after the defendant has been earlier prosecuted for the drug possession. I would therefore dismiss the telephone counts and revise the sentencing phase of the case accordingly.