UNITED STATES of America, Appellee,

v.

Herbert L. CAUDLE, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

Russell Jack HAWKE, Jr., Appellee.

Nos. 79–5013, 79–5014.

United States Court of Appeals,
Fourth Circuit.

Argued July 12, 1979.

Decided Oct. 5, 1979.

Christine Witcover Dean, Raleigh, N. C. (Joseph W. Dean, Raleigh, N. C., on brief), for appellant Caudle.

Roger W. Smith, Raleigh, N. C. (Russell W. DeMent, Jr., Raleigh, N. C., on brief), for appellant Hawke.

Tom Courtland Manning, Asst. U. S. Atty. (George M. Anderson, U. S. Atty. and James L. Blackburn, First Asst. U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

WIDENER, Circuit Judge:

The defendants were indicted for several offenses, all arising out of the procuring of a loan from the Economic Development Administration of the United States Department of Commerce, in the amount of $650,000.00, to Brevard Wood Products, Inc. At the time, the defendant, Russell Jack Hawke, Jr. (hereinafter Hawke) was Federal Co-Chairman of the Coastal Plains Regional Commission; the defendant Herbert L. Caudle, Jr. (hereinafter Caudle) was an entrepreneur interested in establishing a plant in the United States to process lumber imported from South America.

Count One charged both defendants with conspiring to defraud the United States in violation of 18 U.S.C. § 371. Count Two charged Hawke with the commission of an act as an employee of the United States affecting a personal financial interest, in violation of 18 U.S.C. § 208(a), in that he had a prospective employment interest and financial interest in Brevard Wood Products. Count Three charged both defendants with concealing a material fact in a matter within the jurisdiction of the United States in violation of 18 U.S.C. § 1001, by concealing the fact that Hawke would be employed with, and receive twenty percent of the stock of, Brevard Wood Products as soon as he terminated his position as Federal Co-Chairman of the Coastal Plains Regional Commission. Both defendants were charged, in the Fourth Count, with making a false statement as to a material fact in a matter within the jurisdiction of the United States, in violation of 18 U.S.C. § 1001, by submitting to the Economic Development Administration *A Feasibility Study for Brevard Wood Products, Inc.,* which included the allegedly false statement that the study was prepared by Albert Levy Associates,

Inc. The Fifth Count charged Caudle with making a false statement as to a material fact in a matter within the jurisdiction of the United States in violation of 18 U.S.C. § 1001, by submitting to the Economic Development Administration a financial statement (in support of the Brevard Wood Products loan application) which falsely stated Caudle's net worth and which omitted liens and judgments that were outstanding against him.

Both defendants were found not guilty on Counts 1 and 3. The jury found Hawke guilty on Counts 2 and 4, and found Caudle guilty on Counts 4 and 5. From the judgments of conviction, both defendants appeal.

In early June 1976, Hawke, in his capacity as Federal Co-Chairman of the Coastal Plains Regional Commission, asked Dr. Albert Levy (of Albert Levy Associates, Inc.) to prepare a feasibility study to determine the possibility of locating a plant to process lumber imported from South America in the United States, possibly at a location within the jurisdiction of the Coastal Plains Regional Commission. Caudle furnished basic information and materials pertaining to the lumber business either to Dr. Levy directly or to Mr. Hawke, who turned the material over to Dr. Levy. On June 14, the Department of Commerce and the Coastal Plains Regional Commission awarded a $3,500.00 contract to Albert Levy Associates to prepare this study. Dr. Levy completed his report (hereinafter referred to as the "first study"), gave it to Hawke on or about July 15, 1976, and was paid from federal funds. Dr. Levy testified that he had then satisfied his legal obligations to the Coastal Plains Regional Commission. There may have been some question as to the length of this study (the report was four pages), and since Dr. Levy expected to obtain additional material relevant to the study, he agreed to turn these additional materials over to Hawke when he received them.

Caudle, the initiator of the idea that brought on the first study by the government, planned to obtain a loan from the Economic Development Administration

(EDA) in order to start a proposed lumber processing company (which would eventually be named Brevard Wood Products, Inc.). The EDA requires that a feasibility study be submitted with the loan application, and that the study be made by a source independent of the entrepreneur seeking the loan. The defendants' position, both at trial and on appeal, is that Caudle commissioned Dr. Levy to do a feasibility study of Caudle's proposed wood processing business (hereinafter referred to as the "second study"). Caudle supplied some basic materials for this second study. Dr. Levy verified some of the material submitted to him and wrote some material in rough form, but was unable to get the study put together in time. Dr. Levy, in his line of work, apparently customarily prepared the two studies, the first general, the second specific. On September 24, 1976, with Hawke's permission,[1] Dr. Levy turned the materials for the second study over to Caudle. Over the weekend of September 25 and 26, at Hawke's residence, the defendants and several other people compiled the second study. Dr. Levy knew they were compiling the study. This study, *A Feasibility Study for Brevard Wood Products, Inc.*, consisted of seventy pages, plus exhibits, and a cover letter purporting to be signed by Dr. Levy. The letter was actually a photocopy paste-up of an earlier letter from Dr. Levy. It included the Levy letterhead and signature but the body of the letter was composed by Hawke. The letter stated that "enclosed is the feasibility study prepared by Albert Levy Associates, Inc., for Brevard Wood Products." This case centers around the truth or falsity of the statement that the study was prepared by Dr. Levy.

In October 1976, the defendants gave Dr. Levy a copy of the study they had assembled. Dr. Levy then signed a letter identical to the photocopy paste-up letter prepared earlier, and delivered it to the defendants.

The government's position is that Dr. Levy did not prepare this second feasibility study, and therefore the first cover letter contained a false statement. It construes the testimony at trial to indicate that while some of the study was Dr. Levy's work, much of it was prepared by the defendants. The defendants' position is that Dr. Levy did prepare the second feasibility study, which they merely typed and assembled.

The defendants submitted this study to the EDA on October 4, 1976 as an early part of the loan application. It was apparently on the nineteenth of October that Dr. Levy saw the finished study, approved it, and signed a letter identical to the one prepared earlier by the defendants, which stated that the study was prepared by Albert Levy Associates, Inc. Caudle submitted the loan application on November 4, 1976, and accepted the loan offer on February 25, 1977. On August 14, 1978, one month before the trial, the EDA placed the loan in default.

In addition to the feasibility study, the loan application must be accompanied by financial statements for those individuals who will be guarantors and involved in the proposed business. Caudle's financial statement omitted several tax liens and judgments which were then outstanding against him; the statement also omitted some assets. Caudle contends that these were simply careless mistakes caused by filing out many forms hurriedly, that some of the

---

1. This is the basis of the conflict of interest charge against Hawke in Count 2 of the indictment. The government contends that these materials were gathered and possessed by Dr. Levy with respect to the first feasibility study, which the government paid for. By directing or permitting Dr. Levy to turn these materials over to Caudle at a time when he, Hawke, had a prospective employment and financial interest in Brevard Wood Products, the government charged that Hawke participated, personally and substantially, as an employee of the United

States, in a matter in which he had a personal financial interest. There was testimony at trial which indicated that Hawke would become the president of Brevard Wood Products and would own twenty percent of the stock.

Both defendants were acquitted on the Third Count, which charged them with concealing Hawke's prospective interests in Brevard Wood Products.

Dr. Levy testified that he was legally the owner of the materials he turned over to Caudle.

debts he did not consider to be personal, that he had no intent to make a false statement, and that despite the discrepancies, the statement accurately reflected his net worth. He also contends that the mistakes were immaterial.

One of the principal issues at trial was the truthfulness of the statement in the first cover letter to the second study, that Albert Levy Associates, Inc. prepared the feasibility study on Brevard Wood Products which was submitted with the loan application. On direct examination by the government, Dr. Levy testified that he prepared the first feasibility study and submitted it to Hawke, as Federal Co-Chairman of the Coastal Plains Regional Commission; that he agreed to submit additional materials to Hawke as he received them; that he validated some of the information supplied by Caudle for the second study; that some of the materials he gave to Caudle on September 24 were "created by my [Levy's] handwriting," while some of the information had been originally supplied by Caudle; and that no one who was at the Hawke residence when the second study was compiled was employed by Albert Levy Associates, Inc.

On cross-examination by the defendant Caudle, Dr. Levy testified that he had made the first (general or government) study and implied that having the same consultant prepare the second (specific or entrepreneur) study was usual practice; that when he turned the materials over to Caudle, he knew they would be compiled into a final feasibility study; that he requested a copy of the finished product; that he had no objection to his name being used; that, when he saw the finished product, he adopted it and gave Hawke a letter saying that he, Dr. Levy, had prepared the study; that he considered Caudle's proposed wood products company to be a feasible business project; and that it was normal for the study consultant to get a large amount of materials from the entrepreneur.

On cross-examination by the defendant Hawke, Dr. Levy's testimony chiefly concerned the ownership of the first study and of the materials. He also testified, with regard to the second study, that he was embarrassed because he had not produced a more finished product then he did, and when he saw the finished second study, including the photocopy paste-up letter, he typed and signed a genuine letter. Thus, at the conclusion of the direct and cross-examination, it could not be said that the question of who prepared the study was not in doubt.

■ On redirect examination, the United States Attorney took Dr. Levy through a page-by-page examination of the second feasibility study. Such detailed testimony had not been asked for on direct examination. With respect to each page, the question was put as to what part of that page represented Dr. Levy's "original work." Although the U.S. Attorney's questions were phrased in terms of the contents of each page, Dr. Levy answered, in many instances, in terms of whether the particular words, names, spelling, or punctuation were his original work.[2] Dr. Levy also tes-

2. Defense counsel had adequate justification, at the very least, for taking Dr. Levy through a page by page examination of the second study in order to clarify whether Dr. Levy's testimony on redirect, concerning whether parts of the study were his original work, referred to the words of the study or the sense of the study. The following excerpts from Dr. Levy's redirect examination are not atypical:

Q. Directing your attention to page 11. What portion of the contents of page 11 is your original work?
A. Again, the contents only?
Q. Yes, sir. I am speaking now only to contents. . . .

A. Some of the words could be from my notes, but there is a word that I didn't write and that is why I definitely did not write the entire sentence because I don't spell it that way. . . .

\* \* \* \* \* \*

Q. Directing your attention to page 13. What portion of page 13 is, the contents of page 13, is your original work?
A. I believe that most of that full paragraph on that page. I am not sure whether the words 'six to eight percent' are mine. . .

\* \* \* \* \* \*

tified that he regarded himself as the legal owner of the materials for the second study that he turned over to Caudle.

■ Counsel for the defendants, on re-cross examination, sought to take Dr. Levy through a page-by-page examination of the second study as the government had just done. The U. S. Attorney objected "on the basis that he has already been asked that question and answered that question on re-direct examination." Defendants' counsel stated that he wanted to ask Dr. Levy "not as to whether the words were the same, but whether the sense of that is the same." Defense counsel requested "the same privi-lege that the United States Attorney had in going through these individual pages," in order "to show the sense of what this study is and what is his work and what pages in here aren't his or his materials." The court sustained the government's objection on the ground that "this would be essentially the same as going over it on redirect again." The court sustained several objections on these grounds. Based on this, defendants argue that recross examination was denied with respect to crucial points that had been the subject matter of the redirect examina-tion; that this constituted a denial of the right of a criminal accused to cross-examine the witnesses against him; and therefore they are entitled to a new trial. We agree.

The convictions for making a false state-ment with respect to the feasibility study (Count 4) cannot be allowed to stand for two reasons. Although overlapping, in that both concern the rules of evidence, they are nevertheless not the same. The first is largely procedural and concerns the trial court's power to prohibit cross-examination in a given manner. The second concerns the power of the trial court to prohibit cross-examination at all.

■ It is properly within the trial judge's discretion to prevent one party from repeating a question already asked by that party. Where there is more than one de-fendant or defense attorney, it may also be proper to prevent one defense attorney from repeating a question already asked by another defense attorney. See, e. g., *United States v. Miller,* 463 F.2d 600, 601 (1st Cir. 1972); see also 3 Wigmore, *Evidence* § 782(4) (Chadbourn rev. 1970). It is quite a different thing, however, to prevent the defense from asking a question on the grounds that it has already been asked by the prosecution. "Repeating the same tes-timonial matter of the direct examination, by questioning the witness anew on cross-examination, is a process which often be-comes desirable . . . in order to test the witness' capacity to recollect what he has just stated and to ascertain whether he falls easily into inconsistencies and thus be-trays falsification." 3 Wigmore, *Evidence* § 782(3), p. 182 (Chadbourn rev. 1970). The goals of cross-examination cannot be achieved "except by the direct and personal putting of questions." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), quoting 5 J. Wigmore, *Evidence* § 1395, p. 123 (3d ed. 1940). "Cross-exami-nation is a right, because of its efficacy in securing more than could have been expect-ed from a direct examination by a friendly examiner." 3A Wigmore, *Evidence* § 944 (Chadbourn rev. 1970). A defendant's right to cross-examine the witnesses on the sub-ject matter of their direct testimony, can-not be denied merely because the prosecu-tor has already asked the same or similar questions. The questions involved having been asked for the first time on redirect

Q. What portion of page 22 is your original work?
A. Like I said before. I believe that most of the headings is—are mine, because that is where I also recognized the table of contents that I was looking at before.
    The phrasing here and the whole first line here is mine. I did not type it on this page 22, though.
Q. Well, what portion of the contents of page 22 is your original work?

A. Well, many of the words in the first paragraph, sir, are mine. But not the—I did not deal with the figure of 130 employees.
Q. What about the contents, Dr. Levy?
A. The contents?
Q. The contents of page 22. What portion of that is your original work?
A. Well, most of the wording is what I used in the draft. The figures I did not—specially the number 130, I did not use that.

examination, the fact that they had been asked and answered is a reason to permit cross-examination, not a reason to deny it.

■ "There are few subjects, perhaps, upon which [the Supreme] Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). A full cross-examination of a witness upon the subjects of his examination in chief is the right, not the mere privilege, of the party against whom he is called. *Lindsey v. United States,* 77 U.S.App.D.C. 1, 2, 133 F.2d 368, 369 (D.C. Cir. 1942); *Heard v. United States,* 255 F. 829 (8 Cir. 1919). See, e. g., *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Alford v. United States,* 282 U.S. 687, 691, 51 S.Ct. 218, 75 L.Ed. 624 (1931); 2 Wright, *Federal Practice and Procedure,* Criminal § 416 (1969).

It may not be an exaggeration to claim, as Wigmore does, that cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 Wigmore, *Evidence* § 1367 (Chadbourn rev. 1976). And, its efficacy in testing the accuracy and completeness of testimony is so well understood that the right of cross-examination is "one of the safeguards essential to a fair trial." *Alford v. United States,* supra, 282 U.S. at 692, 51 S.Ct. at 219. Evidence supplied through the lips of witnesses is subject not only to the possible infirmities of falsification or bias; it is also subject to the inaccuracies which inevitably flow from the fallibility of human powers of observation, memory, and description. "The annals of the legal profession are filled with instances in which testimony, plausible when supplied on examination in chief, has by cross-examina-

tion been shown to be, for one or more of the reasons mentioned, faulty or worthless." *Lindsey v. United States,* 77 U.S.App.D.C. at 2, 133 F.2d at 369; see, e. g., 3 Wigmore, *Evidence* § 782(3), (4) (Chadbourn rev. 1970). Certainly no one experienced in the trial of lawsuits would deny the value of cross-examination in bringing out the truth; indeed, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

The theory of cross-examination supports what has been learned from years of practical experience. On direct examination, a witness, even if completely unbiased, only discloses part of the necessary facts, chiefly because his testimony is given only by way of answers to specific questions, and the attorney producing him will usually ask only for the facts favorable to his side of the case. Someone must probe for the remaining facts and qualifying circumstances, and ensure that the testimony is accurate, complete, and clearly understood. The best person to do this is the one most vitally interested, namely the opponent.[3] 5 Wigmore, *Evidence* § 1368 (Chadbourn rev. 1974). For these reasons, cross-examination is "a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the Constitution of the United States and in the constitutions of most if not all the States composing the Union." *Pointer v. Texas,* 380 U.S. at 404, 85 S.Ct. at 1068, quoting *Kirby v. United States,* 174 U.S. 47, 55–56, 19 S.Ct. 574, 43 L.Ed. 890 (1899).

■ In this case, issue is taken with the trial court's limitation of recross examination. However, the reasons we have given in support of the right of cross-examination apply with equal strength to recross examination where new matter is brought out on

---

**3.** The second major function of cross-examination (which is not involved in the instant case) is to show that the witness is biased, prejudiced, or untrustworthy for any reason. "The *facts which diminish the personal trustworthi-* *ness or credit of the witness* will also, in every likelihood, have remained undisclosed on the direct examination." 5 Wigmore, *Evidence* § 1368, p. 37 (Chadbourn rev. 1974). (Italics in original.)

redirect examination. Examining counsel is normally expected to elicit everything from a witness, so far as possible, at the first opportunity. Where, as here, new matter is brought out on redirect examination, the defendant's first opportunity to test the truthfulness, accuracy, and completeness of that testimony is on recross examination. 6 Wigmore, *Evidence* § 1896 (Chadbourn rev. 1976); McCormick, *Evidence* § 32 (1972). To deny recross examination on matter first drawn out on redirect is to deny the defendant the right of any cross-examination as to that new matter. The prejudice of the denial cannot be doubted.

In *Cossack v. United States,* 63 F.2d 511 (9th Cir. 1933), the government called an important witness after it had rested its case. After direct examination by the government and "considerable cross-examination," there was redirect examination and recross examination, after which the witness was excused. At the defendant's request, the witness was recalled for further recross examination for the purpose of laying a foundation for impeachment. The trial court's refusal to allow this line of questioning on recross examination was held to be reversible error, because the defendant was denied the right to cross-examine the witnesses against him. *United States v. Morris,* 485 F.2d 1385 (5th Cir. 1973), held that where no new matter is brought out on redirect examination, there is no constitutional right to recross examination, but the court reiterated that the right to recross examination does exist where new matter is brought out in the redirect. See also *United States v. Dana,* 457 F.2d 205 (7th Cir. 1972) (no undue limit in confining the recross examination to the scope of the redirect).

Wigmore takes the same view as the cases. "No doubt cases may arise in which redirect examination may make relevant certain new evidence for which there was no prior need or opportunity, and for this purpose a recross examination becomes proper; in such cases it is sometimes said to be a matter of right. But for other matters there is ordinarily no such need, and the allowance of recross examination depends in such cases on the consent of the trial court." VI Wigmore, *Evidence* (Chadbourn rev. 1976) § 1897.

█ The government argues that the trial court properly exercised its discretion by restricting the defendants' questions on the recross examination of Dr. Levy.[4] Many decisions do recognize that the trial judge has broad discretion to control the scope and extent of cross-examination. E. g. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931). However, entirely consistent with that rule, the cases also recognize that it "is only after the right of cross-examination has been substantially and thoroughly exercised that the allowance of further cross-examination becomes discretionary with the trial court." *Hartzell v. United States,* 72 F.2d 569, 585 (8th Cir. 1934). See, e. g., *United States v. Pugh,* 141 U.S.App.D.C. 68, 436 F.2d 222 (D.C. Cir. 1970); *Arnold v. United States,* 94 F.2d 499, 506 (10th Cir. 1938). Other cases state the same rule in somewhat different terms, e. g., *United States v. Mayer,* 556 F.2d 245, 250 (5th Cir. 1977) (The trial court's "discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth

---

4. Federal Rule of Evidence 611(a) and (b):

(a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

(b) Scope of cross-examination. Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of its discretion, permit inquiry into additional matters as if on direct examination.

Amendment"); *United States v. Greenberg,* 423 F.2d 1106, 1108 (5th Cir. 1970) ("discretion of the court to limit the scope of cross-examination does not become operative until a party has had an opportunity to exercise the right of cross-examination"); *United States v. Jordan,* 466 F.2d 99, 105 (4th Cir. 1972) (Judge Sobeloff dissenting) ("But all issues concerning cross-examination do not melt away upon invocation of the trial judge's discretion . . . . In concrete terms, then, the trial judge's discretion insulates only his decision that an *area* of cross-examination has been *sufficiently explored* and that further inquiry would be pointless. . . . A considerably stricter standard applies when an appellate court is called upon to review a ruling which *foreclosed altogether* a valid area of cross-examination. . .") (Emphasis in original.)

The trial court's ruling in this case precluded all cross-examination of Dr. Levy as to what part of each page of the second study was his original work. Since the defendants did not have an opportunity to exercise the right of cross-examination on this issue, the trial court's discretion to limit cross-examination simply did not become operative. Put another way, the trial court does not have discretion to curtail cross-examination until after the questioner has had a reasonable chance to pursue the matters raised on direct. "It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop." *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931). The trial court here did not give the defendants that reasonable latitude in cross-examination which is essential to a fair trial.

■ In summary, we are of opinion the defendants had the right to cross-examine Dr. Levy on the matter of the page by page explanation of the report, first brought into the case by the government on redirect examination. The denial by the trial court of this right is prejudicial error. We do not believe the discretion of the trial court to limit the scope or extent of cross-examina-tion came into play in this case because the defendants never had the opportunity to cross-examine Dr. Levy at all on the subject raised by the redirect examination. The discretion of the trial court to limit the extent and scope of cross-examination does not extend so far as preclude cross-examination at all. We do not construe FRE 611(a) and (b) as contrary to this opinion.

■ Each of the defendants was convicted on two separate counts. In addition to conviction for submitting the false statement regarding authorship of the second feasibility study (Count 4), Hawke was convicted on the conflict of interest charge (Count 2), and Caudle was convicted for submitting a false financial statement (Count 5). The entire case, however, including these counts, centered around one transaction—procuring a loan from the Economic Development Administration. Although the erroneous restriction of cross-examination may have directly affected Count 4 only, it is highly probable that the defendants were prejudiced on the other counts as well. In these circumstances, our duty to "require such further proceedings to be had as may be just under the circumstances," 28 U.S.C. § 2106, requires a remand for a new trial on all counts. See, e. g., *United States v. Stevenson,* 409 F.2d 354 (7th Cir.), cert. den., 404 U.S. 857, 92 S.Ct. 108, 30 L.Ed.2d 99 (1969); *United States v. Barash,* 365 F.2d 395, 400 (2d Cir. 1966), cert. den., 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1967); *Edwards v. United States,* 265 F.2d 302 (9th Cir. 1959). See also *Benton v. Maryland,* 395 U.S. 784, 798, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

Because we believe that a new trial must be awarded in all events, we do not reach the other errors assigned. The judgments of conviction must be vacated and a new trial awarded.

VACATED AND REMANDED FOR A NEW TRIAL.