54 F.3d 774
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Charles W. BAXTER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jeffrey C. McWILLIAMS, Defendant-Appellant.
 Nos. 94-5103, 94-5400.
 United States Court of Appeals, Fourth Circuit.
 Argued: Dec. 9, 1994.
Decided: May 22, 1995.
 
 ARGUED: Denise Charlotte Barrett, Assistant Federal Public Defender, Baltimore, MD, for Appellant McWilliams; Richard Christopher Bittner, Baltimore, MD, for Appellant Baxter. Joseph Lee Evans, Assistant United States Attorney, Baltimore, MD, for Appellee.
 ON BRIEF: James K. Bredar, Federal Public Defender, Baltimore, MD, for Appellant McWilliams. Lynne A. Battaglia, United States Attorney, Baltimore, MD, for Appellee.
 Before ERVIN, Chief Judge, and MURNAGHAN and WILKINS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Jeffrey McWilliams and Charles Baxter have appealed their convictions for charges relating to a 1993 bank robbery committed in Maryland. Baxter has also challenged his sentence. For the reasons stated below, we affirm the district court's rulings as to both defendants.
 
 I. Facts
 
 2
 On March 7, 1993, William Duke and Jeffrey McWilliams arrived in Ocean City, Maryland, concluding a trip that began in Albuquerque, New Mexico. Amy Esparaza, McWilliams' girlfriend, had traveled with them as far as Missouri, where the men dropped her off at her parents' house. McWilliams was in possession of Esparaza's gun after they left her in Missouri.
 
 
 3
 On the day of their arrival in Ocean City, Duke and McWilliams went to the home of Charles Baxter, who was a friend of McWilliams. That evening, the three men sat down to talk and drink. Their conversation turned to money, and they discussed robbery as a means of obtaining cash. Although Duke and McWilliams testified that they did not take the discussion of robbery seriously because they had been drinking, they actually left Baxter's home at some point during the evening to case a local convenience store that was suggested by Baxter as a target. Eventually, as the three men continued to drink together, they arrived at the idea of robbing a bank. Duke stated at trial that he and McWilliams agreed to rob the bank only to pacify Baxter, and promised each other that they would not go through with the robbery when they woke up the next morning.
 
 
 4
 However, the next day, Duke, Baxter, and McWilliams made plans to rob the Calvin B. Taylor Bank, located in Ocean City. Baxter supplied a jacket, bandanna, and hat to Duke, McWilliams gave him shoes, and Duke carried the handgun owned by Esparaza. Baxter described the local roads to Duke and explained the best way to escape after the robbery. The defendants later claimed that Duke had unloaded the handgun before leaving the apartment.
 
 
 5
 Duke rode Baxter's motorcycle to an Exxon gas station located across the street from the targeted bank, and Baxter and McWilliams followed in McWilliams' Mustang. At approximately 11:20 a.m., McWilliams entered the bank, pretending to be interested in opening an account. When he came out, he reported to Duke and Baxter that there were three female employees inside and no customers. Duke rode closer to the bank and parked the motorcycle, but lost his nerve and returned to the Exxon station. After Baxter ridiculed him, Duke returned to the bank. Duke, his face covered with the bandanna, entered the bank and pointed the gun at bank employees Charlene Shockley, Crystal Bunting, and Tina Kolarik. He demanded money and was given approximately $2,975. He fled on Baxter's motorcycle.
 
 
 6
 Duke met Baxter and McWilliams back at Baxter's apartment, and the three drove to Salisbury, Maryland. Baxter rode the motorcycle, and Duke and McWilliams drove in McWilliams' car. The men attempted to leave the motorcycle at a shop to be serviced, but when the shop would not take it, they brought the motorcycle to the home of one of Baxter's friends in Salisbury. At the friend's house, the three divided up the money from the robbery. McWilliams and Baxter then took Duke to a hotel in Salisbury, where McWilliams filled out a hotel registration form for him. McWilliams and Baxter returned to Ocean City.
 
 
 7
 The police in Ocean City had meanwhile learned of the robbery and were able to identify Baxter as the owner of the motorcycle. On that same day, the state police located Baxter and McWilliams at the radio station where Baxter worked part-time. The police took Baxter and McWilliams back to Baxter's apartment, where another state trooper was waiting. Upon questioning, Baxter stated that his motorcycle was in Salisbury, but that he could produce it the next day. He told the officers that his friend "Will" had used the motorcycle that morning, but stated that he did not know Will's last name or where he was. McWilliams, too, told police that he did not know Duke's last name, referring to him as "Doland" or "Dulin." Both men said that they had dropped Duke off at a Burger King in Salisbury. They did not reveal to the police that Duke was actually staying at a hotel in the area, and made no mention of the bank robbery or of the stolen money in their possession.
 
 
 8
 The police asked Baxter and McWilliams to accompany them to the bank to view a video surveillance film to determine whether "Will" was the bank robber in the film. At the bank, both men stated that the robber in the videotape was not the person whom they referred to as "Will." However, while Baxter and McWilliams were at the bank, some bank employees recognized McWilliams as the man who had been there that morning asking about accounts shortly before the robbery.
 
 
 9
 After leaving the police and returning to his apartment, Baxter instructed his girlfriend to throw away the jacket that Duke had worn in the robbery. Duke called McWilliams at Baxter's apartment later that evening. When he heard that the police had been looking for him, Duke became increasingly frightened and left Salisbury in a taxi to Washington, D.C. There, he boarded a Greyhound bus headed for Dallas, Texas.
 
 
 10
 The next day, Baxter took his motorcycle to the Maryland state police barracks. McWilliams arrived shortly thereafter. McWilliams and Baxter were questioned throughout the course of the afternoon and early evening by state police and an agent from the Federal Bureau of Investigation (FBI). Fairly soon after the onset of the questioning, McWilliams directed the police to the gun used in the robbery and to some of the stolen money located in his car. He also produced two photo identifications of "Will" Duke. The police recovered the gun and the money. McWilliams later admitted that the three defendants had discussed robbing a convenience store, but that they had chosen to rob a bank instead. He said that Baxter had picked the bank, and McWilliams had cased it. McWilliams later repeated this story to the FBI.
 
 
 11
 Baxter consented to a police search of his apartment, and directed the police to a vase in which he and McWilliams had hidden some of the stolen money. More money was found in McWilliams' shaving kit. Baxter also led the police to the dumpster in which the jacket that Duke had worn during the robbery was thrown. When confronted with McWilliams' admissions, Baxter eventually admitted his own role in the robbery and gave an oral statement that was identical to McWilliams'. At the conclusion of their oral statements, the defendants were charged with state offenses related to the robbery. Each of them also made a written statement. The next day, more of the stolen money was found in a speaker compartment behind the rear seat of McWilliams' car.
 
 
 12
 Baxter and McWilliams told the police that they had left Duke at a hotel in Salisbury. The police traced Duke's route, and local police arrested him when his bus stopped in Dallas, Texas. At the time of his arrest, Duke lied about several things, including his identity. He was searched, and robbery proceeds were found in his sock.
 
 
 13
 On March 18, 1993, a Grand Jury for the District of Maryland indicted Duke, McWilliams, and Baxter for one count of conspiracy to commit bank robbery, under 18 U.S.C. Sec. 371; bank robbery, under 18 U.S.C. Sec. 2113(a); armed bank robbery, under 18 U.S.C. Sec. 2113(d); use of a firearm in the commission of a crime of violence, under 18 U.S.C. Sec. 924(c); and aiding and abetting under 18 U.S.C. Sec. 2. On September 21, 1993, Duke pled guilty to counts two and four, charging bank robbery and the use of a firearm. He received a sentence of seventy-eight months imprisonment and three years of supervised release, and agreed to testify against the other two defendants.
 
 
 14
 The trials of defendants Baxter and McWilliams were severed from each other. Baxter's trial began on September 27, 1993, and on October 1, 1993, the jury returned a guilty verdict on the charges of conspiracy, robbery, and armed robbery. The jury found Baxter not guilty of the charge of using a firearm in the commission of a crime of violence. Baxter was sentenced on February 7, 1994, to a term of sixty months imprisonment for conspiracy, seventy-six months for robbery, and seventy-six months for armed robbery, with all sentences to run concurrently. McWilliams' trial started on February 14, 1994, and he was found guilty on all counts on February 18, 1994. On May 23, 1994, McWilliams was sentenced to concurrent terms of forty months imprisonment each for conspiracy, robbery, and armed robbery. He was sentenced to a sixty-month consecutive term for the use of a firearm in the commission of a crime of violence. He was also placed on three years supervised release. The defendants were ordered to pay restitution, jointly and severally, in the amount of $1,263.07. At their respective trials, McWilliams and Baxter each denied participation in the bank robbery. They admitted lying to police several times, but denied having made certain oral statements to which law officers testified.
 
 
 15
 McWilliams' and Baxter's appeals were consolidated by this court. On appeal, both defendants have challenged the district court's limitation of their cross-examination of Duke, the government's key witness. Baxter has also claimed error in the district court's refusal to remove a certain juror for misconduct during his trial, a jury instruction regarding false exculpatory statements, and an enhancement of his offense level at sentencing.
 
 II. McWilliams
 A.
 
 16
 McWilliams has contended on appeal that the trial court erred in limiting his cross-examination of Duke, the key government witness, and has claimed that he was thereby deprived of his right to confrontation under the Sixth Amendment. A trial judge has broad discretion in limiting the scope of cross-examination. United States v. Caudle, 606 F.2d 451, 458 (4th Cir.1979). However, "the trial court does not have discretion to curtail cross-examination until after the questioner has had a reasonable chance to pursue the matter raised on direct." Id. at 459. Thus, the trial judge's discretion to limit cross-examination does not come into play until a party has had at least some opportunity to delve into an issue. See id.
 
 
 17
 Duke was called as a witness at McWilliams' trial. After being questioned on the stand regarding his plea agreement, Duke was asked by the prosecution, "Do you have any other criminal convictions, Mr. Duke?", to which he replied, "No sir, I don't." During a bench conference, the defense stated that it wished to introduce Duke's 1991 juvenile delinquency adjudication for burglary of a habitat, for which Duke had successfully completed probation and was discharged. The defense argued that the prosecution had opened the door to the introduction of the adjudication by asking about Duke's prior convictions, but the prosecution pointed out that the question on direct examination had only addressed "convictions," which the juvenile adjudication was not. The judge did not allow cross-examination on the juvenile adjudication, finding that such an adjudication was not considered a conviction and that the prosecution had not opened the door to such questioning by asking solely about convictions. In addition, taking into account Federal Rule of Evidence (FRE) 609, "Impeachment by Evidence of Conviction of Crime," the court felt that it would be misleading to the jury to allow cross-examination on the topic. The defense has argued on appeal that evidence of the juvenile adjudication should have been admissible either (1) under FRE 608(b) as specific instances of conduct, or (2) to contradict Duke's direct testimony.
 
 
 18
 Under FRE 608(b),
 
 
 19
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, .... may ... in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....
 
 
 20
 The defense has contended that although Rule 609(d) states that "[e]vidence of juvenile adjudications is generally not admissible under this rule " (emphasis added), evidence of the facts underlying Duke's juvenile adjudication could be admitted under Rule 608(b) as specific instances of conduct. However, since the defense did not raise a Rule 608(b) argument in the district court, and the court did not have the opportunity to address the merits of such an argument, we decline to reach the defendant's Rule 608(b) claim, since no plain error has been committed. See United States v. Reedy, 990 F.2d 167, 168 n. 2 (4th Cir.), cert. denied, 114 S.Ct. 210 (1993); see also Fed. R.Crim. Proc. 52(b).
 
 
 21
 McWilliams' next argument in support of the admissibility of the juvenile adjudication is that evidence that is otherwise inadmissible may become admissible to contradict a witness' direct testimony. FRE 609(d) provides:
 
 
 22
 Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.
 
 
 23
 McWilliams has asserted that the juvenile adjudication should have been admissible to contradict Duke's testimony on direct examination that he had no prior convictions. He has contended that by asking Duke about convictions, the prosecution opened the door to questions regarding Duke's other adjudications. McWilliams has further argued that the distinction between a conviction and a juvenile adjudication is "technically fine."
 
 
 24
 We note that the distinction between convictions and juvenile adjudications is sufficiently important to have warranted explicit mention both in FRE 609 and in the case law. See, e.g., United States v. LeBlanc, 612 F.2d 1012, 1013 (6th Cir.) (assignment to "youthful trainee status" for larceny from a building, calling for one year's probation, was not considered a conviction under Rule 609), cert. denied, 449 U.S. 849 (1980); United States v. Canniff, 521 F.2d 565, 570-71 (2d Cir.1975) (youthful offender adjudications are not considered criminal convictions), cert. denied, 423 U.S. 1059 (1976). However, we agree with McWilliams that, under certain circumstances, the admission of juvenile adjudication evidence is warranted. In Canniff, the Second Circuit held that the admission of a question posed by the prosecution during trial regarding a youthful offender adjudication did not constitute error requiring reversal, in part because the witness' counsel had opened the door to such an inquiry by eliciting a statement from him that he had no prior convictions.[1] The court stated:
 
 
 25
 Although a youthful offender adjudication may not normally be used to impeach a witness, the attempt to do so in the present case does not require reversal. In the first place, the witness' own counsel, by eliciting from [the witness] that he had never been convicted of a crime, opened the door to the inquiry. Despite the distinction between a conviction and a youthful offender adjudication, it would be unfair to the government to permit a defendant who had been adjudicated a youthful offender to create the erroneous impression that he was lily-white by implying to the jury, which cannot be expected to draw such fine distinctions, that he had never committed any offense at all.
 
 
 26
 Canniff, 521 F.2d at 570 (citations omitted). Although the facts of Canniff differ from those of the instant case, the principles expressed in Canniff apply to the situation at hand. Duke was able, through the prosecution's question regarding prior convictions, to give the jury the impression that he had never committed another illegal act. The jury cannot be expected, without some explanation, to realize that a carefully worded question concerning "convictions" does not rule out other possible offenses. We find the reasoning of Canniff persuasive, and hold that the district court abused its discretion by refusing to permit questions relating to Duke's juvenile adjudication.
 
 
 27
 However, the court's ruling constituted harmless error. See United States v. Francisco, 35 F.3d 116, 118 (4th Cir.1994) (per curiam), cert. denied, 115 S.Ct. 950 (1995). "In deciding whether a constitutional error was harmless, a reviewing court must be satisfied that the error was harmless beyond a reasonable doubt." United States v. Blevins, 960 F.2d 1252, 1262 (4th Cir.1992). Assessing whether the denial of cross-examination on a certain subject constitutes harmless error "requires a quantitative assessment of the likely impact of the error measured against the other evidence presented at trial." Id. at 1263; see also United States v. Velazquez, 847 F.2d 140, 143 (4th Cir.1988) (the questionable admission of evidence may be harmless where other overwhelming evidence of a defendant's guilt exists).
 
 
 28
 In the instant case, Duke's credibility was attacked on the stand despite the exclusion of the juvenile adjudication evidence. Duke was questioned regarding his plea and the time that he would serve in prison. His involvement in the instant offense was thereby made clear to the jury. See United States v. Ashley, 569 F.2d 975, 979 (5th Cir.) (finding that the trial court's refusal to allow a juvenile conviction into evidence for purposes of impeachment was harmless error, because evidence of the conviction would have been cumulative to that of other convictions which could be used for impeachment), cert. denied, 439 U.S. 853 (1978). In addition, there was a great deal of evidence concerning McWilliams' guilt. He was identified by tellers in the bank as someone who had been there shortly before the robbery; he admitted helping Duke escape; he admitted casing a convenience store the night before the robbery; he admitted possessing some of the money that came from the robbery; he admitting lying to law enforcement officers; and when questioned, he directed police to the gun used in the robbery.
 
 
 29
 In view of the overwhelming evidence of McWilliams' guilt, it was harmless error for the trial judge to prohibit questioning of the government's witness on a juvenile adjudication.
 
 B.
 
 30
 McWilliams has further argued that it was error on the part of the district court to prohibit him from questioning Duke regarding charges pending for Duke's issuance of worthless checks. There was a warrant outstanding in New Mexico for Duke's arrest on these charges. McWilliams wished to question Duke at trial regarding the charges and each of the facts underlying them until Duke felt compelled to invoke his privilege under the Fifth Amendment in front of the jury. He has argued that the district court erred in preventing him from doing so.
 
 
 31
 McWilliams' argument is flawed. McWilliams has stated that he should have been able to ask about the facts underlying Duke's charges, because they were highly probative of Duke's credibility. However, McWilliams was permitted to ask Duke about the pending charges; the trial court did not prevent that line of questioning. In fact, the defense asked Duke about the charges three separate times on the stand. After the third time, the district judge told defense counsel to cease questioning regarding the pending charges. Counsel asked about the charges yet again, and Duke specifically stated that he did not wish to talk about that case. The government stipulated to the fact that there were warrants outstanding for Duke's arrest, even though the witness had already admitted the existence of the warrants. The district judge did not prohibit defense counsel from inquiring about the worthless check charges, and the judge was certainly within his discretion in preventing counsel from persisting in the line of questioning after counsel had asked three times and had received the same answer each time. See FRE 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ... protect witnesses from harassment or undue embarrassment.").
 
 
 32
 McWilliams also wished Duke to be forced by his counsel's questioning to assert his Fifth Amendment privilege in front of the jury. McWilliams seems to have thought that Duke's explicit assertion of the privilege would have been more prejudicial to Duke's credibility than his refusing to answer the questions posed to him and repeatedly stating that he did not wish to discuss the matter. The prosecution asserted at trial, and has reasserted in its brief, that Duke's unwillingness to answer the questions posed to him was equivalent to invoking the privilege. The prosecution's argument has the support of the Supreme Court:
 
 
 33
 It is agreed by all that a claim of the privilege does not require any special combination of words. Plainly a witness need not have the skill of a lawyer to invoke the protection of the Self-Incrimination Clause.... [T]he fact that a witness expresses his intention in vague terms is immaterial so long as the claim is sufficiently definite to apprise the [court] of his intention. As everyone agrees, no ritualistic formula is necessary in order to invoke the privilege.
 
 
 34
 Quinn v. United States, 349 U.S. 155, 162, 164 (1955) (footnotes omitted); see also Mills v. United States, 281 F.2d 736, 740-41 (4th Cir.1960) (affirming the district court's finding that the statement "I just refuse to answer" constituted an invocation of a witness' Fifth Amendment rights).
 
 
 35
 Duke's statements in the instant case were tantamount to an invocation of his Fifth Amendment privilege. The district court was thus correct in cutting off McWilliams' questioning regarding Duke's pending bad check charges. The judge had discretion to limit harassing cross-examination of a witness.
 
 III. Baxter
 
 36
 We now turn to defendant Baxter. Baxter has claimed that the district court precluded him from cross-examining Duke regarding two previous bank robberies for which he had not been charged and thereby prevented him from showing that Duke, rather than Baxter, masterminded the robbery in the instant case. Baxter has also claimed that he was not allowed effective cross-examination of Duke, because the witness refused to answer questions regarding his involvement in a bad check scheme. In addition, Baxter has raised challenges to the district court's refusal to remove a juror during his trial, an instruction given to the jury regarding false exculpatory statements, and an enhancement given to him at sentencing.
 
 A.
 
 37
 During cross-examination of Duke, Baxter's counsel asked him whether there was a charge pending for a bank robbery in which he was involved in Texas. Duke denied the charge. Later, defense counsel again asked about Duke's connection with the bank in Texas, and also about another bank. Duke again denied knowing anything about the subject. The government objected to the questioning and the judge sustained the objection, stating that there was insufficient evidence for the defense to continue the questioning.
 
 
 38
 Contrary to Baxter's claims, the defense was not precluded from pursuing its line of questioning. The question regarding the Texas bank robbery was asked and answered more than once. The Federal Rules of Evidence provide:
 
 
 39
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.
 
 
 40
 FRE 608(b). The rule goes on to state that the trial judge may allow inquiry into specific instances of conduct on cross-examination, if they are probative of truthfulness or untruthfulness. In the instant case, the defense asked about the alleged bank robbery and received a negative response. Under Rule 608(b), the defense was not allowed to produce extrinsic evidence of the alleged robberies once the witness denied knowledge of them, and the line of questioning thus ended once the questions had been answered. The district judge did not prevent the defense from going into the issue. In addition, it was within the judge's discretion to cut off questioning after the robberies had been inquired into twice. See Caudle, 606 F.2d at 458-59.
 
 B.
 
 41
 Baxter has also argued, as has McWilliams, that he was prejudiced by his inability to ask Duke about the charges pending against him regarding worthless checks. In actuality, counsel for Baxter inquired into the bad check charges at least five times during the cross-examination of Duke. Duke explicitly stated that the case was pending, and that he did not wish to talk about it. The district court finally sustained an objection to the line of inquiry.
 
 
 42
 For the same reasons as stated above regarding the identical claim of McWilliams, the district court was correct in ruling that Baxter could not continue questioning Duke about the pending bad check charges. The district judge was within his discretion in limiting cross-examination of the witness.
 
 C.
 
 43
 Baxter's counsel contended at trial that a woman in the jury was tapping other jurors on the shoulder and asking them questions during the trial. He asked that she be removed. The district judge stated that he had not noticed any inappropriate activity by the jurors, and that he would watch them more closely. When Baxter objected again, the judge stated:
 
 
 44
 I do not know what to say other than you and I are making different observations.
 
 
 45
 I have been trying to keep more of an eye on the jury since you were up here the last time. All I can say is, again, I have not noticed certainly no untoward activity at all[sic]. I have not noticed any communication of any kind between any of the jurors. If there has been any, it's been so minimal and so inconsequential, I am not about to intervene, to say anything, or to do anything.
 
 
 46
 Baxter has argued that it was an abuse of discretion for the trial judge to refuse to remove the juror.
 
 
 47
 The district judge has the discretion to remove a juror when the judge is convinced that the juror cannot fulfill his or her duties. See, e.g., United States v. Fajardo, 787 F.2d 1523, 1525 (11th Cir.1986); United States v. Cameron, 464 F.2d 333, 335 (3d Cir.1972) (per curiam); see also Fed. R.Crim. Proc. 24(c) ("Alternate jurors ... shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties."). The district judge in the instant case clearly was convinced by the situation that there was no juror misconduct. He observed the jurors especially closely and found nothing inappropriate in their behavior. The judge considered the issue and decided, in his discretion, that there was no reason to remove the juror. We see no justification for disturbing this ruling.
 
 D.
 
 48
 Baxter's next assertion of error concerns an instruction given by the district court regarding false exculpatory statements:
 
 
 49
 You have heard testimony that the defendant made some statements to law enforcement authorities in which the defendant claimed that his conduct was consistent with innocence, not guilt. The Government claims that these statements in which he exonerated or exculpated himself were false.
 
 
 50
 If you find that the defendant gave a false statement in order to divert suspicion from himself, you may but you are not required to, infer that the defendant believed that he was guilty. You may not, however, infer on this basis alone that the defendant is, in fact, guilty of any of the crimes for which he is charged.
 
 
 51
 Whether or not the evidence as to a defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to that, are matters for you and you alone to decide.
 
 
 52
 Baxter has contended that allowing such an instruction was confusing to the jury, since it told the jury "that once they found guilt, they could find consciousness of guilt, which in turn is probative of guilt." While Baxter has recognized that we have, in the past, allowed instructions which inform the jury that they may infer consciousness of guilt from false exculpatory statements, see, e.g., United States v. Cogdell, 844 F.2d 179, 181 (4th Cir.1988); United States v. McDougald, 650 F.2d 532, 533 (4th Cir.1981) (per curiam), he has urged this court instead to adopt the approach of the First Circuit concerning instructions on false exculpatory statements.
 
 
 53
 Baxter has cited United States v. Littlefield, 840 F.2d 143 (1st Cir.), cert. denied, 488 U.S. 860 (1988), for the First Circuit's view. In that case, the court stated that "an instruction on consciousness of guilt should not be given when, as in this case, the jury could find the exculpatory statement at issue to be false only if it already believed evidence directly establishing the defendant's guilt." Id. at 149. However, the court also pointed out that an instruction on consciousness of guilt "is considered appropriate when the evidence shows an action on the part of the defendant that normally could be viewed as an awareness of guilt, such as ... a false statement." Id. at 148 (footnote omitted). We choose to adhere to our previous position regarding the use of false exculpatory statements, and hold that the district judge in the instant case did not abuse his discretion by giving the jury an instruction regarding false exculpatory statements.
 
 E.
 
 54
 Baxter was acquitted of the count of his indictment that charged the use of a firearm in the commission of a crime of violence. In the pre-sentence report, however, the probation officer gave Baxter a five-level enhancement for brandishing, displaying, or possessing a firearm in the course of a robbery, under Sec. 2B3.1(b)(2)(C) of the United States Sentencing Guidelines. The defense objected to this enhancement, but the district court determined that the enhancement was appropriate. The appellate standard of review of a district court's application of the Sentencing Guidelines is articulated in 18 U.S.C. Sec. 3742(e):
 
 
 55
 The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.
 
 
 56
 The district judge's application of the Sentencing Guidelines is reviewed on appeal under a clearly erroneous standard when the issue depends upon a factual determination. United States v. Jones, 31 F.3d 1304, 1315 (4th Cir.1994); United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989). When the issue is one of the legal interpretation of the Guidelines, our review moves closer to a de novo standard. Jones, 31 F.3d at 1315; Daughtrey, 874 F.2d at 217. On mixed questions of law and fact regarding the Guidelines, we apply a due deference standard in reviewing the district court. Daughtrey, 874 F.2d at 217. The standard of proof used at sentencing is a preponderance of the evidence. See United States v. Engleman, 916 F.2d 182, 184 (4th Cir.1990).
 
 
 57
 Baxter has argued that when his sentence was enhanced by five levels, he was punished for acquitted conduct, since he had been acquitted of the charge of using a firearm in the commission of a crime of violence. In response, the government has pointed out that the sentence enhancement was not based on acquitted conduct, because although Baxter was acquitted of the use of a firearm charge, he was also convicted of armed robbery.[2] The prosecution has thus contended that the jury concluded beyond a reasonable doubt that Baxter was criminally responsible for the handgun used by Duke in the robbery, and it was appropriate to sentence him accordingly.
 
 
 58
 However, even disregarding the fact that Baxter was convicted of armed robbery, the sentencing judge was permitted to consider acquitted conduct in sentencing the defendant. We, along with other circuits, have held that acquitted conduct may be used as a basis upon which to enhance a defendant's offense level under the Guidelines for the counts of which he was found guilty. See United States v. Isom, 886 F.2d 736, 738-39 (4th Cir.1989); see also United States v. Welch, 945 F.2d 1378, 1385 (7th Cir.1991), cert. denied, 502 U.S. 1118 (1992); United States v. Rodriguez-Gonzalez, 899 F.2d 177, 181-82 (2d Cir.), cert. denied, 498 U.S. 844 (1990); United States v. Mocciola, 891 F.2d 13, 16-17 (1st Cir.1989). In Isom, we pointed out that the burden of proof at sentencing, a preponderance of the evidence standard, differs greatly from the beyond a reasonable doubt standard required for a conviction. Isom, 886 F.2d at 738 n. 3. The sentencing court may consider facts underlying an acquittal as long as those facts seem reliable. Mocciola, 891 F.2d at 17.
 
 
 59
 In the instant case, there was reliable evidence that Baxter saw the gun used by Duke and that he told the police that the gun was in McWilliams' car. The district judge found by a preponderance of the evidence that Baxter knew about the gun and anticipated its use in a robbery by Duke. The judge's finding was clearly supported by a preponderance of the evidence, and his enhancement of Baxter's offense level was proper.
 
 IV. Conclusion
 Accordingly, the judgments are
 
 60
 AFFIRMED.
 
 
 
 [1]
 The Federal Rules of Evidence were not controlling in Canniff. See Canniff, 521 F.2d at 569-70 n. 3. However, the Rules, and specifically Rule 609, were cited by the court, and the youthful offender conviction issue was decided on the basis of the principles embodied in Rule 609(d)
 
 
 [2]
 After trial, Baxter challenged what he perceived to be an inconsistency between his conviction on the armed robbery charge and acquittal on the use of a firearm charge. He does not, however, make an argument addressing this inconsistency on appeal